450 A.2d 1376

**In the Matter of Mildred J. TERWILLIGER, an alleged incompetent.**

**Appeal of Mildred J. TERWILLIGER.**

Superior Court of Pennsylvania.

Argued April 26, 1982.

Filed Sept. 24, 1982.

554

556

Sharon L. Smith, Brookville, for appellant.

David G. Matson, Brookville, for Melvin and Florence Terwilliger, participating parties.

Lawrence A. Frolik, Pittsburgh, submitted a brief on behalf of American Civil Liberties, participating party.

Eva Borsody Das and Ilene W. Shane, Philadelphia, submitted a brief on behalf of Developmental, participating party.

Before BECK, MONTEMURO and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the Order of the Court of Common Pleas of Jefferson County, Orphans' Court Division, appointing a guardian for Mildred J. Terwilliger and authorizing said guardian to give consent to the sterilization of his ward.

We vacate and remand for proceedings consistent with this Opinion.

The scenario of this case began to unfold with the filing of a Petition for Appointment of Guardian of The Person of Mildred J. Terwilliger by Melvin L. and Florence K. Terwilliger, the parents of the ward. In said Petition, Melvin sought to have Mildred declared incompetent and to have himself appointed as guardian for the purpose of consenting to Mildred's sterilization by means of a tubal ligation. The court, after a hearing, granted both requests by Order dated May 8, 1981. Thereafter, Mildred's court-appointed counsel appealed the Order. Moreover, pursuant to a Petition For Supersedeas filed by counsel for Mildred, the lower court stayed its May 8, 1981, Order pending the outcome of the appeal. *See* Pa.R.App.P. 1732, 1733 and 1736. Additionally, Mildred's counsel also secured the appointment of Carol Holland as her guardian *ad litem.*

The issue raised on appeal for our consideration, which all parties concede is one of first impression in this Commonwealth, is whether the trial court had the power to authorize a guardian to consent to the sterilization of a person adjudged incompetent. Inextricably tied to such an issue is the determination of whether there was sufficient evidence presented by the petitioning parties to justify the lower court's ruling that tubal ligation was warranted.

On the question of jurisdiction, we observe that the petition for the appointment of a guardian was filed in the

Orphans' Court division of the Court of Common Pleas of Jefferson County. The authority of said court, to entertain such a petition, is specifically set forth in 20 Pa.C.S.A. § 712 (Supp.1982–83) and reads:

"§ 712. Nonmandatory exercise of jurisdiction through orphans' court division

The jurisdiction of the court of common pleas over the following may be exercised through either its orphans' court division or other appropriate division:

(1) Title to real estate. The determination of the persons to whom the title to real estate of a decedent or of the creator of an estate or trust has passed by devise or descent or by the terms of the trust instrument where jurisdiction of such estate or trust is exercised through the orphans' court division: Provided, That nothing herein shall be construed to restrict the provisions of section 711 of this code (relating to mandatory exercise of jurisdiction through orphans' court division in general) relating to distribution of real estate in an estate or trust.

(2) *Guardian of person. The appointment, control and removal of the guardian of the person of any incompetent.*

(3) Other matters. The disposition of any case where there are substantial questions concerning matters enumerated in section 711 (relating to mandatory exercise of jurisdiction through orphans' court division in general) and also matters not enumerated in that section.

(4) Powers of attorney. All matters pertaining to the exercise of powers of attorneys in fact or agents acting under powers of attorney as provided in Chapter 56 (relating to powers of attorney) when the principal is or may be deceased, disabled or incapacitated." (Emphasis added)

Based on the preceding, jurisdiction to hear the instant matter was not restricted solely to the orphans' court, but could have been pursued in another "appropriate division" of the court of common pleas. *Id.; see also In re Estate of R.*

*L. L.,* 487 Pa. 223, 409 A.2d 321 (1979). Thus, it cannot be gainsaid that under 42 Pa.C.S.A. § 931 (1981) the courts of common pleas, "hav[ing] unlimited original jurisdiction of all actions and proceedings," have been vested with the mantle of authority to rule on the petition for the appointment of a guardian. Moreover, under 42 Pa.C.S.A. § 323 (1981), captioned "Powers," and dealing with the general structure and authority of the courts of this Commonwealth, it is set forth that:

> "Every court shall have power to issue, under its judicial seal, every lawful writ and process necessary or suitable for the exercise of its jurisdiction and for the enforcement of any order which it may make and all legal and equitable powers required for or incidental to the exercise of its jurisdiction, and, except as otherwise prescribed by general rules, every court shall have power to make such rules and orders of court as the interest of justice or the business of the court may require."

Consequently, it appears that neither by statute nor case law has the jurisdiction granted to the courts of common pleas, in particular the orphans' court division, been circumscribed to foreclose consideration of a petition seeking authorization for a guardian to consent to an incompetent's sterilization. *See Stump v. Sparkman,* 435 U.S. 349, 356–358, 98 S.Ct. 1099, 1104–1105, 55 L.Ed.2d 331, 338–340 (1978).

Having reached the conclusion that the orphans' court was a proper forum for ruling on the petition in question, we must now decide, as a necessary corollary thereto, whether the relief granted (authority to consent to the performance of a tubal ligation) had any basis in law, be it statutory or judicial. Initially, we observe, and all parties agree, that no statute exists in Pennsylvania that *specifically* authorizes a guardian to consent to a sterilization operation on behalf of his or her ward.

Although a court-appointed "guardian" is vested with the "care and management of the person ... under legal disability[,]" 46 P.S. § 601(47) (1969); *see Daniels v. Metropolitan Life Insurance Co.,* 135 Pa.Super. 450, 5 A.2d

608 (1939), the appointee, being an officer of the court, is always under the court's control and is subject to its directions as to the person of the ward. *See generally Beaver's Estate,* 121 Pa.Super. 159, 182 A. 744 (1936); *In re Shenk,* 5 Lanc.Rev. 361 (1950). This has been interpreted by some courts to mean:

"... that prior judicial approval is required before a guardian may consent to administering or withholding of proposed extraordinary medical treatment. E.g., *Guardian of Roe,* —— Mass. ——, Mass.Adv.Sh. (1981) 981, 421 N.E.2d 40; *In the Matter of Spring,* [380 Mass. 629, 405 N.E.2d 115 (1980)]; *Superintendent of Belchertown State School v. Saikewicz,* [373 Mass. 728, 370 N.E.2d 417 (1977)]. Since sterilization is an extraordinary and highly intrusive form of medical treatment that irreversibly extinguishes the ward's fundamental right of procreative choice, we conclude that a guardian must obtain a proper judicial order for the procedure before he or she can validly consent to it. Guardians and parents, therefore, absent statutory or judicial authorization, cannot consent to the sterilization of a ward in their care or custody." *In re Matter of Moe,* 385 Mass. 555, ——, 432 N.E.2d 712, 716–717 (1982).

We agree with the aforesaid on the basis that the Commonwealth, acting in its role as *parens patriae,* has the right and the duty to act to protect its weaker members. *See In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978) (termination of parental rights); *see also In re Green,* 273 Pa.Super. 397, 417 A.2d 708 (1980) (involuntary commitment); *Commonwealth v. Johnson,* 211 Pa.Super. 62, 234 A.2d 9 (1967) (juvenile proceedings); *Commonwealth ex rel. Snively v. Snively,* 206 Pa.Super. 278, 212 A.2d 905 (1965) (child support); *Commonwealth ex rel. Tate v. Shovlin,* 205 Pa.Super. 370, 208 A.2d 924 (1965) (proceedings under the mental health act).

■ Despite the fact that the doctrine of *parens patriae* has been subject to criticism, *see, e.g., In re Gault,* 387 U.S. 1, 16, 87 S.Ct. 1428, 1437–38, 18 L.Ed.2d 527 (1967), there is general agreement that the state is not precluded from

acting to protect its citizenry and to require both parents and children to act in ways beneficial to society. *In re William L., supra,* 477 Pa. at 338, 383 A.2d at 1236. As stated by our Supreme Court:

"The state's responsibility to protect its weaker members authorizes interference with parental autonomy and decisionmaking in appropriate circumstances. The moral and practical importance of this authority was set forth by Chief Justice Maxey in *Commonwealth ex rel. Children's Aid Society v. Gard:*

'Societies which like the relator are entrusted by the sovereign with power over the lives of infants should ever bear in mind that consideration for the sensibilities of children and solicitude for their well-being is the hallmark of an humane individual and of a civilized state.'

362 Pa. 85, 99, 66 A.2d 300, 307 (1949)." *Id.,* 477 Pa. at 338, 383 A.2d at 1236.

The *parens patriae* power of our courts derives from the inherent equitable authority of the sovereign to protect those persons within the state who cannot protect themselves because of a legal disability. *See* 67A C.J.S. Parens Patriae at 159 (1978). Consistent therewith, it is acknowledged that a court's authority is at its widest reach when acting as an equity court to protect the person or property of an incompetent, *In re Matter of C. D. M.,* 627 P.2d 607 (Alaska, 1981); *In re Grady,* 85 N.J. 235, 426 A.2d 467 (1981), and has been described as "plenary and potent to afford whatever relief may be necessary to protect his interests." 27 Am.Jur.2d Equity § 69, at 592 (1969). However, it is noteworthy to mention that, as we have stated in the past, " ' "[t]he admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness." ' " (Citation omitted) *Commonwealth v. Johnson,* 211 Pa.Super. at 71, 234 A.2d at 15 (1967).

This doctrine of inherent *parens patriae* jurisdiction over incompetents has been extended to decisions involving irrevocable consequences for the incompetent individual.

For example, courts have accepted responsibility for deciding whether to authorize a kidney transplant from an incompetent to his gravely ill brother, *Strunk v. Strunk,* 445 S.W.2d 145 (Ky.App.1969); whether to consent on behalf of the incompetent to shock treatment, *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (1976); whether to administer chemotherapy treatment, *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); and whether to discontinue artificial life support mechanisms, *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). Given the aforecited, we see no reason why the orphans' court's inherent *parens patriae* jurisdiction should not apply as well to a petition for sterilization of an incompetent. Although there are a number of jurisdictions that have refused to approve of such authority in the absence of legislation, *see e.g., Sparkman v. McFarlin,* 552 F.2d 172 (7th Cir. 1977), *rev'd sub nom. Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Wade v. Bethesda Hosp.,* 337 F.Supp. 671 (S.D.Ohio 1971); *Guardianship of Tulley,* 83 Cal.App.3d 698, 146 Cal.Rptr. 266 (1978), *cert. denied,* 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979); *Guardianship of Kemp,* 43 Cal.App.3d 758, 118 Cal.Rptr. 64 (1974); *In re S. C. E.,* 378 A.2d 144 (Del.Ch.1977); *A. L. v. G. R. H.,* 163 Ind.App. 636, 325 N.E.2d 501 (1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1669, 48 L.Ed.2d 178 (1976); *Holmes v. Powers,* 439 S.W.2d 579 (Ky.Ct.App.1968); *In re M. K. R.,* 515 S.W.2d 467 (Mo.1974); *Application of A. D.,* 90 Misc.2d 236, 394 N.Y.S.2d 139 (Surr.Ct.1977), aff'd on other grounds, 64 A.D.2d 898, 408 N.Y.S.2d 104 (1978); *Smith v. Command,* 231 Mich. 409, 204 N.W. 140 (1925); *Frazier v. Levi,* 440 S.W.2d 393 (Tex.Civ.App.1969), we view such decisions as being insensitive to the constitutional rights of the incompetent person.[1] Furthermore, we side with the minority of

1. In the case at bar, the fundamental right involved is that of a person to be sterilized. *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (right to sterilization implicitly recognized); *In re Matter of Moe,* 385 Mass. 555, ——, 432 N.E.2d 712, 719 (1982). Mildred Terwilliger has the same constitutional

courts that have found inherent power (*parens patriae*) to decide these issues, as well as acknowledging the existence of a statutory scheme in this Commonwealth delineating the scope of authority and power vested in our unified court system to address and remedy such an issue as faced by the lower court instantly. *See In re Matter of Moe, supra; In re Matter of C. D. M., supra; In re Grady, supra.* As aptly stated by the Supreme Court of Alaska on this question of jurisdiction:

"Indeed, to ignore this well-settled doctrine [*parens patriae*] in favor of the so-called majority rule would amount to nothing less than an abdication of our judicial responsibilities, leaving [the incompetent] and her parents without any means of recourse. Although we recognize that this petition, and others like it, present many troublesome questions, we are also 'mindful that a court "cannot escape the demands of judging or of making .... difficult appraisals." ' *Guardianship of Hayes,* 93 Wash.2d 228, 608 P.2d 635, 637 (1980), *quoting Haynes v. Washington,* 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513, 521 (1963)." *In re Matter of C. D. M., supra,* 627 P.2d at 611; *see also Stump v. Sparkman, supra.*

Therefore, we determine that the orphans' court, albeit a court of limited jurisdiction, *see Jervis Will,* 443 Pa. 226, 279 A.2d 151 (1971); *In re Sadowski's Estate,* 158 Pa.Super. 119, 43 A.2d 907 (1945), does have the power, given its statutory (42 Pa.C.S.A. § 323 and 20 Pa.C.S.A. § 712) and inherent (*parens patriae*) authority, to review and act upon a petition seeking authorization for a guardian to consent to the sterilization of an incompetent.

right of privacy as anyone else to choose whether or not to undergo sterilization. Unfortunately, if the trial court, after a hearing, determines that she lacks the ability to make that choice for herself, we do not pretend that the choice of her guardian to consent to sterilization would be her own choice. As the court in *In re Grady, supra,* stated:

"... it is a genuine choice nevertheless—one designed to further the same interests she might pursue had she the ability to decide herself. We believe that having the choice made in her behalf produces a more just and compassionate result than leaving [the incompetent] with no way of exercising a constitutional right." *Id.* at 262, 426 A.2d at 481.

■ Having established that the orphans' court does, in fact, have jurisdiction over the subject matter of the petition, we now turn to the minimum standards that should govern the court's exercise of this jurisdiction. *We caution that because sterilization necessarily results in the permanent termination of the intensely personal right of procreation, the trial judge must take the greatest care to ensure that the incompetent's rights are jealously guarded. In re Matter of C. D. M., supra.*

In formulating the procedural requirements that need to be met in ruling on a petition for sterilization, and the concomitant standard of proof essential to such determination, we have assiduously reviewed those court decisions which have dealt with the identical subject matter. *See In re Matter of Moe, supra; In re Matter of A. W.,* 637 P.2d 366 (Supr.Ct.Colo.1981); *In re Matter of C. D. M., supra; In re Grady, supra.*

■ Preliminarily, we note that in making the decision of whether to authorize sterilization, a court should consider *only* the best interest of the incompetent person, not the interests or convenience of the individual's parents, the guardian or of society. *In re Grady, supra.* While on this topic, it is to be noted that we will demand from the advocates of the proposed operation proof by clear and convincing evidence that sterilization is in the best interest of the incompetent. *In re Matter of C. D. M., supra, quoting Addington v. Texas,* 441 U.S. 418, 433, 99 S.Ct. 1804, 1813, 60 L.Ed.2d 323, 335 (1979). We believe that such a standard of proof is necessary in a case such as this one, where a fundamental right is concerned. *In re Matter of A. W., supra; In re Matter of C. D. M., supra; In re Grady, supra.* The United States Supreme Court has mandated no less of a standard of proof in the analogous case of a civil commitment proceeding. *Addington v. Texas, supra.* In Pennsylvania, we require the clear and convincing evidence standard for involuntary civil commitment. *Commonwealth ex rel. Gibson v. DiGiacinto,* 261 Pa.Super. 53, 395 A.2d 938 (1978), rev'd on other grounds, 497 Pa. 66, 439 A.2d 105 (1981).

Thus, because of our overriding concern to prevent any abuse of judicial authority, we are prompted to establish no less of a standard in cases which require the determination of whether sterilization is in the best interest of an incompetent person.

Having set forth the standard of proof that obtains, we will proceed to delineate those requirements which must be complied with as a condition precedent to legitimizing a court order authorizing a guardian to consent to the sterilization of an incompetent.

■ First, upon the filing of the petition with the court, the judge shall appoint an independent guardian *ad litem,* who will vigorously defend the interests of the incompetent at a full judicial hearing. It goes without saying that due notice of the proceedings must be given to all interested parties to guarantee adherence to the requirements of procedural due process under the law. The guardian *ad litem* must have full opportunity to meet with the ward, present evidence and cross-examine witnesses at the hearing. In addition, to ensure that adequate evidence will be presented, the court must assure itself that a comprehensive medical, psychological and social evaluation is made of the incompetent. *In re Matter of Moe, supra; In re Matter of A. W., supra; In re Matter of C. D. M., supra; In re Grady, supra.* If need be, the trial judge is not foreclosed from appointing its own experts to assist in the evaluation of the incompetent's best interests by examining the individual or testifying at the hearing. *Ibid.*

■ On the question of whether the incompetent person should be present at the hearing, we are of the view that the judge presiding over the proceeding must meet with the individual to obtain his own impressions of competency, regardless of whether he decides ultimately that the incompetent's presence either is or is not required at the hearing. The meeting need not be conducted formally and can occur in any convenient and appropriate place, such as chambers, counsel's office, an institution or the incompetent person's

home. The trial judge should talk with the person and observe the person's physical and mental condition. More importantly, the incompetent should be given the opportunity to express his or her own views on the subject being reviewed, and, albeit not controlling, his or her wishes not to be sterilized must weigh heavily against authorizing the procedure. *See In re Matter of A. W., supra; In re Grady, supra.* Despite the fact that the individual may be labelled an "incompetent person," does not mean that his or her apparent preferences can be totally ignored. *In re Matter of C. D. M., supra.*

 Secondly, the trial judge must find that the individual lacks capacity to make a decision about sterilization and that the incapacity is not likely to change in the foreseeable future. *In re Matter of C. D. M., supra; In re Grady, supra.* Therefore, the proponent of sterilization has the burden of proving by clear and convincing evidence that the person to be sterilized lacks the capacity to consent or withhold consent. *In re Grady, supra.*

 Thirdly, the person for whom sterilization is requested must be proven capable of reproduction. In the instant case, such a determination need not be made, inasmuch as the person sought to be sterilized has already given birth out of wedlock. Within this framework, it must be established that *sterilization is the only practicable means of contraception,* i.e., all less drastic contraceptive methods, including supervision, education and training are unworkable and detailed medical testimony must show that the sterilization procedure requested is the least significant intrusion necessary to protect the interests of the individual. *In re Matter of Moe, supra; In re Matter of A. W., supra; In re Matter of C. D. M., supra.* Toward this end, and in addition to the aforesaid, we adopt the following guidelines, as set forth by the court in *In re Grady, supra,* to facilitate the trial judge's determination of whether clear and convincing proof has been presented to establish that sterilization is in the incompetent's best interest:

"(2) The possibility that the incompetent person will experience trauma or psychological damage if she becomes pregnant or gives birth, and, conversely, the possibility of trauma or psychological damage from the sterilization operation.

(3) The likelihood that the individual will voluntarily engage in sexual activity or be exposed to situations where sexual intercourse is imposed upon her.

(4) The inability of the incompetent person to understand reproduction or contraception and the likely permanence of that inability.

\* \* \* \* \* \*

(7) The ability of the incompetent person to care for a child, or the possibility that the incompetent may at some future date be able to marry and, with a spouse, care for a child.

(8) Evidence that scientific or medical advances may occur within the foreseeable future which will make possible either improvement of the individual's condition or alternative and less drastic sterilization procedures.

(9) A demonstration that the proponents of sterilization are seeking it in good faith and that their primary concern is for the best interests of the incompetent person rather than their own or the public's convenience." (Footnote omitted) *Id.* at 264, 426 A.2d at 483.

 It is to be noted that a similar analysis is to be made where sterilization is requested for a male. We see no justification for formulating a different standard, i.e., sterilization is to be authorized only when it is in the individual's best interest.

 We hasten to caution that the above-stated guidelines are not intended to be an exhaustive list of the factors which the trial court should consider before ruling on a petition for sterilization. Rather, they constitute what we believe to be the minimal requirements that need to be examined to protect the constitutional rights of the incompetent. The need for additional inquiries and the weight to be

given to each factor will vary with the particular facts and circumstances of each case. *In re Matter of C. D. M., supra.* Additionally, because of the sensitive and irrevocable nature of a sterilization operation, we wish to make it clear that appellate review of the instant type of case will be of the broadest scope, and this Court will not be bound by the inferences or deductions of the lower court. *See Bender v. Bender,* 261 Pa.Super. 12, 395 A.2d 279 (1978) (custody case); *In re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977) (semble); *Commonwealth ex rel. Hickey v. Hickey,* 213 Pa.Super. 349, 247 A.2d 806 (1968) (semble).

Given the importance of the fundamental procreative rights involved and the potential for abuse in connection with termination of those rights, we find there is a compelling need to have developed a more searching inquiry into the best interest of the incompetent, including, e.g., the medical necessity or other justification for the procedure called for, and a careful explanation of, as well as a more incisive look at, less drastic alternative forms of birth control than have been set forth in the instant record. In the absence of such evidence, this Court is hampered in its effort to render a jurisprudentially sound ruling.

■■■ A review of the evidence substantiates this Court's determination that the record is woefully deficient on an issue of such magnitude. For example, at the March 20, 1981, hearing, the trial court made its determination that Mildred was incompetent; that the appointment of a guardian on her behalf was necessary; and sterilization was justified on the testimony of: 1) Mildred's father; 2) the family physician; 3) a visiting nurse; 4) the local chief of police; and 5) Mildred herself. An examination of the evidence presented falls short of complying with the standards set forth by this Court in the case at bar.[2]

2. At this point, we wish to acknowledge the considerable assistance we have received from the amicus briefs filed by the American Civil Liberties Union of Pittsburgh and The Development Disabilities Advocacy Network, Inc., of Pennsylvania.

At the hearing, Mildred's father testified that his daughter was 25 years old and had attended "special schooling." However, he stated she could neither read nor write. The father also recounted that because of Mildred's mental deficiency, she has been exploited; e.g., she has given birth to an illegitimate child in December of 1980 and continues to be the object of designing men. Such conduct has persisted for "a period of over maybe two years." As far as the care and feeding of the infant is concerned, Mildred has assumed none of her maternal duties; rather, her parents have taken it upon themselves to raise the child.

The next witness to take the stand was Dr. Wayne S. McKinley, the Terwilliger's family physician. In the course of his testimony, he opined that Mildred was retarded. Such conclusion was predicated upon knowledge that Mildred had attended special education classes and that she was not able to keep pace with the normal education process. Additionally, the witness noted that, two years prior to the hearing, he had to fill out documents for Social Security in regard to Mildred's competency and retardation. In the course thereof, the doctor observed that Mildred could not add two and two, nor could she write her name. These deficiencies led the witness to "conclu[de] that she was incompetent and retarded." On cross-examination, Dr. McKinley admitted that an effective alternative to sterilization would be the birth control pill, at least, "[f]or a while." Nonetheless, he discounted the feasibility of such an approach since he doubted that: 1) Mildred could "count[ ] her pills," necessitating her parents to maintain constant monitoring of her intake; and 2) "the hectiness [sic] and all the friction that is prone to be in th[e Terwilliger] household, or lack of [a] household." (N.T. 24–25)

It is interesting to note that when questioned by the trial judge as to whether Mildred understood her own sexuality and the consequences thereof, Dr. McKinley stated: "I'm right on the fence there. In a way I wonder that, too[.]" *Id.* at 25. Later on in the questioning, although the witness dismissed the practicability of any alternative form of birth

control, save for surgery, he admitted: "... I'd frankly, I'd have gone along with the pill here—go along with it—go along with an IUD suggestions. It's my favorite operation." *Id.* at 28.

The third witness, the visiting nurse, made merely conclusionary statements as to Mildred's lack of maternal instinct, which were premised on Mildred's absence from the home when the nurse appeared, twice a week, to supervise the baby's care and health.

The chief of police, for the Brookville Police Department, also appeared and testified to no more than his observations of Mildred walking the streets of the community in the earlier morning hours, that citizens had informed him of being propositioned by Mildred and that Mildred could be sexually abused by several men in the community.

The last witness to take the stand was Mildred. Her testimony consisted of no more than two and a quarter pages of the record in toto. During the questioning, which was conducted by court-appointed counsel, Mildred stated that she understood the consequences of sterilization, and that she did not want any more children because her father told her to have "[n]o more." *Id.* at 39. Additionally, the test results administered by the Clarion Intermediate Unit was introduced into evidence, which indicated that Mildred's I.Q. was 33. After her testimony, the hearing came to a close and the trial court, thereafter, entered his order granting the petition which is the subject of the instant appeal.

When the evidence adduced at the March 20th hearing is aligned against the standards itemized by this Court today, it becomes obvious that a remand is necessary in order to develop a more comprehensive and detailed record on all the relevant issues before a clear and convincing case for sterilization can be established.

We vacate the Order of the lower court and remand the case for further proceedings consistent with this opinion. Jurisdiction is not retained by this Court.