### *In re* WIRSING (ON REMAND)

Docket No. 159638. Submitted September 9, 1994, at Detroit. Decided October 24, 1995, at 9:10 A.M. Leave to appeal sought.

Donna L. Wirsing, as guardian of Lora Faye Wirsing, a developmentally disabled person, petitioned the Genesee County Probate Court for authorization to consent to the sterilization of Lora for birth control purposes. The court, Thomas L. Gadola, J., granted authorization. An intervening party, the Michigan Protection and Advocacy Service, appealed, and the Genesee Circuit Court, Earl E. Borradaile, J., affirmed the decision of the probate court. The intervenor then sought leave to appeal. The Court of Appeals, MARILYN KELLY and JANSEN, JJ. (FITZ-GERALD, P.J., dissenting), denied leave to appeal in an unpublished order entered February 25, 1992 (Docket No. 144319). The Supreme Court, in lieu of granting leave to appeal remanded the case to the Court of Appeals for consideration as on leave granted to determine whether probate judges possess the power to authorize a guardian to consent to the sterilization of a developmentally disabled ward. 441 Mich 886 (1992).

On remand, the Court of Appeals *held:*

A probate judge does not possess the power to authorize a guardian to consent to the sterilization of a developmentally disabled ward. Although the Legislature specifically authorized the surgical sterilization of developmentally disabled wards for fifty-one years before the enactment of the revised Mental Health Code in 1974, MCL 330.1600 *et seq.*; MSA 14.800(600) *et seq.*, the Legislature chose not to enact statutory authorization for sterilization of developmentally disabled persons in the revised Mental Health Code. Probate courts now lack the necessary statutory jurisdiction and power to authorize a guardian to consent to the surgical sterilization of a developmentally disabled ward.

Reversed and remanded.

---

#### REFERENCES

Am Jur 2d, Guardian and Ward §§ 23.5, 61, 62, 67, 68; Incompetent Persons § 32.

Jurisdiction of court to permit sterilization of mentally defective person in absence of specific statutory authority. 74 ALR4th 1210.

See ALR Index under Zoning.

HOLBROOK, JR., J., dissenting, stated that MCL 330.1629; MSA 14.800(629) is not ambiguous. Read together, § 629 and § 631 (MCL 330.1631; MSA 14.800[631]) permit a probate judge to authorize a guardian to consent to the sterilization of a developmentally disabled ward. The majority's interpretation of the relevant statutory provisions denies an incompetent developmentally disabled person the same right to procreative choice that is accorded to a competent person, violating state and federal constitutional guarantees of privacy, equal protection, and due process. The Mental Health Code does contain statutory safeguards sufficient to allow the statute to pass constitutional muster.

COURTS — PROBATE COURTS — JURISDICTION.

Probate courts do not have the statutory jurisdiction or power to authorize the guardian of a developmentally disabled ward to consent to the surgical sterilization of the ward.

*Herbert J. Booth* and *John P. Siler,* for Donna L. Wirsing.

Michigan Protection & Advocacy Service (by *Dorothy Smith, Calvin Luker,* and *Deborah A. Mattison*), for the appellant.

### ON REMAND

Before: GRIBBS, P.J., and HOLBROOK, JR., and P. S. TERANES,* JJ.

GRIBBS, P.J. In 1981, eighteen-year-old Lora Faye Wirsing (the ward) was adjudicated to be a developmentally disabled person as a result of congenital retardation. Her mother, Donna L. Wirsing, was appointed as her plenary guardian under the Mental Health Code, MCL 330.1600 *et seq.*; MSA 14.800(600) *et seq.* In March 1986, Donna L. Wirsing, as guardian of the ward, petitioned the probate court for authorization to consent to sterilization of the ward for birth control

---

* Circuit judge, sitting on the Court of Appeals by assignment.

purposes. After holding an extensive hearing, the probate judge granted authorization to the guardian to consent to sterilization. An intervenor in the action, Michigan Protection and Advocacy Service, sought leave to appeal. The Court of Appeals, MARILYN KELLY and JANSEN, JJ. (FITZGERALD, P.J., dissenting), denied leave to appeal in an unpublished order entered February 25, 1992 (Docket No. 144319).

The Michigan Supreme Court, in lieu of granting leave to appeal, remanded the case to this Court for consideration as on leave granted "to consider, without limitation, whether probate judges possess the power to authorize a guardian to consent to the sterilization of a developmentally disabled citizen." *In re Wirsing,* 441 Mich 886; 495 NW2d 388 (1992). We conclude that a probate court judge does not have such power.

Const 1963, art 6 deals with the judicial branch of government and sets forth the various courts of the state and the powers thereof. Article 6, § 15 sets forth the jurisdiction, powers, and duties of the probate court. This section of the constitution specifically directs that the "jurisdiction, powers and duties" of the probate court shall be "provided by law."

As noted by the Michigan Supreme Court in *Buback v Governor,* 380 Mich 209; 156 NW2d 549 (1968), the constitutional convention of 1961 distinguished between the terms "provided by law" and "prescribed by law":

> *Where "provided by law" is used, it is intended that the legislature shall do the entire job of implementation.* Where only the details were left to the legislature and not the overall planning, the committee used the words "prescribed by law." See

2 Official Record, Constitutional Convention of 1961, pp 2673, 2674. [*Id.* at 226. Emphasis added.]

In the early part of the twentieth century, legislators around the country passed statutes allowing the sterilization of mentally ill persons. In 1913, the Michigan Legislature passed Public Act 34, which allowed the sterilization of "mentally defective" persons who were supported by public expense in a public institution. In 1918, the statute was declared unconstitutional because it applied only to persons in public institutions. *Haynes v Lapeer Circuit Judge,* 201 Mich 138; 166 NW 938 (1918). In 1923, the Michigan Legislature enacted Public Act 285, which again authorized the sterilization of mentally defective persons. This act was held to be constitutional by the Michigan Supreme Court. *Smith v Wayne Co Probate Judge,* 231 Mich 409; 204 NW 140 (1925). 1923 PA 285 was repealed and replaced by 1929 PA 281, allowing sterilization of insane and mentally ill persons in order to prevent them from procreating.

1929 PA 281 remained in effect until 1974, when the Legislature completely revised the Mental Health Code, MCL 330.1600 *et seq.*; MSA 14.800(600) *et seq.*, repealing in effect 1929 PA 281. The revised Mental Health Code did not refer to sterilization in any manner. In 1977, the Legislature passed MCL 330.1629; MSA 14.800(629), which gave immunity to guardians of developmentally disabled persons for medical treatment approved by the guardian, including extraordinary medical procedures. In 1978, the Legislature enacted 1978 PA 527, which amended MCL 331.1629; MSA 14.800(629) to include sterilization as an extraordinary medical procedure:

(1) A guardian, temporary guardian, plenary,

partial, or standby guardian shall not be liable for civil damages by reason of authorizing routine or emergency medical treatment or surgery or extraordinary procedures when previously ordered by the court for his or her ward if the guardian acted after medical consultation with the ward's physician, acted in good faith, was not negligent, and acted within the limits established for the guardian by the court.

(2) A guardian, temporary guardian, plenary, partial, or standby guardian who has been authorized by the court to give medical consent, shall not be liable by reason of his or her authorization for injury to the ward resulting from the negligence or other acts of a third person.

(3) Routine medical services do not include extraordinary procedures. Extraordinary procedures includes [sic], but is not limited to, sterilization, including vasectomy, abortion, organ transplants from the ward to another person, and experimental treatment.

The petitioner-guardian argues that MCL 330.1629; MSA 14.800(629), read in conjunction with MCL 330.1631; MSA 14.800(631), gives the probate court the power to authorize the guardian of a developmentally disabled ward to allow surgical sterilization of the ward. The petitioner-guardian argues that this authority comes by implication and that the Legislature would not refer to sterilization of a developmentally disabled person as one of the extraordinary procedures from which a guardian is immune if the Legislature did not intend to allow a probate court to authorize a guardian to allow such sterilization.

This Court does not agree with petitioner's interpretation. The jurisdiction of the probate court cannot arise by implication. As the Michigan Supreme Court stated in interpreting Const 1963, art 6, § 15:

The Constitution of 1963 does not define the entire jurisdiction of probate courts. This responsibility is left to the legislature by article 6, § 15:

"The jurisdiction, powers and duties of the probate court and of the judges thereof shall be provided by law. . . ."

The provision of the 1963 Constitution last above quoted placed the responsibility on the legislature to draft the law but did not grant authority for departure from the requirements and proscriptions of the Constitution. [*Buback, supra* at 226-227].

See also *Ashbaugh v Sinclair,* 300 Mich 673, 676; 2 NW2d 810 (1942); *In re Brown,* 149 Mich App 529; 386 NW2d 577 (1986). The jurisdiction and powers of the probate court are derived entirely by statute.

It is clear that the Mental Health Code permits the probate court to have jurisdiction over guardianship proceedings regarding a developmentally disabled person. MCL 330.1604(1); MSA 14.800(604)(1), MCL 330.1618; MSA 14.800(618). The probate court also has authority to establish the scope and the duration of a guardianship. MCL 330.1631; MSA 14.800(631), MCL 330.1626; MSA 14.800(626). These powers of the probate court are specifically provided by law.

Under Const 1963, art 6, § 15, the probate court's jurisdiction, powers, and duties are confined to those provided by law. The Legislature must, therefore, specifically set forth by statute the jurisdiction, powers, and duties of the probate court. The probate court's jurisdiction, powers, and duties cannot be implied, and this Court will not read into the Mental Health Code the intent of the Legislature, particularly on so weighty a matter as this. If the Legislature intended to authorize the surgical sterilization of developmentally disabled

wards, it could do so specifically as it has in the past. Sterilization was specifically and continuously authorized by the Legislature until 1974 by 1913 PA 34, by 1923 PA 285, and by 1929 PA 281. Sterilization was not included when 1929 PA 281 was repealed by enactment of the revised Mental Health Code of 1974, MCL 330.1600 *et seq.*; MSA 14.800(600) *et seq.* When the statute was later amended in 1977, express authority to authorize sterilization was still not included in the statute. In 1978, the statute was again amended to grant immunity to guardians who authorized "extraordinary procedures" such as "sterilization." One might speculate that the amendment providing immunity was intended to shield guardians who had consented to procedures such as sterilization before 1974.

In any event, for whatever reason, the Legislature chose not to enact statutory authorization for sterilization of developmentally disabled persons in the revised Mental Health Code of 1974, even though authorization had been specifically permitted for more than fifty-one years before that time. We conclude that the probate court now lacks the necessary statutory jurisdiction and power to authorize a guardian to consent to the surgical sterilization of a developmentally disabled ward.

We believe it would be injudicious to conclude, by mere implication, that the Legislature intended to give the probate court authority concerning sterilization of developmentally disabled persons. It is equally as likely that the omission of express authorization signifies a legislative intent to remove the authority previously given to the probate courts. We are especially concerned because adequate safeguards are not provided by statute to assure that the ward has the guarantee of due

process and it is not appropriate for this Court to provide such procedures here.

In summary, for over fifty-one years the Legislature considered and expressly authorized by statute the probate courts to grant a guardian permission to surgically sterilize a developmentally disabled ward. Since 1974, the Legislature has amended the Mental Health Code three times and, in each instance, sterilization was *not* expressly authorized. After half a century of express authority granted to a court of *limited* jurisdiction, we are now asked to rule that such authority has existed by implication for the last decade. This we refuse to do.

Therefore, we conclude in this case that the probate court did not have the jurisdiction or power to authorize the guardian of the ward to allow the ward's surgical sterilization.

Because the probate court lacked authority to authorize sterilization of the ward, we need not address the issue whether the ward's due process rights were protected and whether the guardian met her burden of proof to show that the ward should have undergone surgical sterilization.

This matter is reversed and remanded for action consistent with this opinion. We do not retain jurisdiction.

P. S. TERANES, J., concurred.

HOLBROOK, JR., J. *(dissenting).* The majority has misread an unambiguous provision of the Mental Health Code (MHC) and erected a virtually insurmountable obstacle to the exercise of procreative choice by developmentally disabled citizens of this state. Accordingly, I dissent.

I

A

"The jurisdiction, powers and duties of the probate court and of the judges thereof shall be provided by law." Const 1963, art 6, § 15. Thus, neither the jurisdiction of the probate court nor the powers and duties of probate judges can be enlarged or restricted by the courts of this state. *In re Kasuba Estate,* 401 Mich 560, 566; 258 NW2d 731 (1977); *D'Allessandro v Ely,* 173 Mich App 788, 794; 434 NW2d 662 (1988).

Pursuant to Chapter 6 of the MHC, the probate court is vested with jurisdiction over guardianship proceedings for developmentally disabled persons (DDP).[1] MCL 330.1604(1); MSA 14.800(604)(1). Consistent with this grant of jurisdiction, probate judges have statutory authority to adjudicate petitions for the appointment of guardians, MCL 330.1618; MSA 14.800(618), to establish the scope and duration of the guardianship, MCL 330.1620; MSA 14.800(620), MCL 330.1626; MSA 14.800(626), to set forth the specific duties of the guardian, MCL 330.1631; MSA 14.800(631), and to adjudicate petitions for the discharge of a guardian or modifi-

---

[1] The statute defines "developmental disability" as

an impairment of general intellectual functioning or adaptive behavior which meets the following criteria:

(i) It has continued since its origination or can be expected to continue indefinitely.

(ii) It constitutes a substantial burden to the impaired person's ability to perform normally in society.

(iii) It is attributable to 1 or more of the following:

(A) Mental retardation, cerebral palsy, epilepsy, or autism.

(B) Any other condition of a person found to be closely related to mental retardation because it produces a similar impairment or requires treatment and services similar to those required for a person who is mentally retarded.

(C) Dyslexia resulting from a condition described in subparagraph (A) or (B). [MCL 330.1600(e); MSA 14.800(600)(e).]

cation of an existing order of guardianship, MCL 330.1637; MSA 14.800(637).

Subsection 602(1) of the MHC sets forth the purposes and bases for guardianship of a DDP:

> Guardianship for developmentally disabled persons shall be utilized only as is necessary to promote and protect the well-being of the person, including protection from neglect, exploitation, and abuse; shall be designed to encourage the development of maximum self-reliance and independence in the person; and shall be ordered only to the extent necessitated by the person's actual mental and adaptive limitations. [MCL 330.1602(1); MSA 14.800(602)(1).]

To encourage the development of maximum self-reliance and independence in developmentally disabled citizens, partial guardianships are preferred. MCL 330.1602(2); MSA 14.800(602)(2). However, where it is determined by clear and convincing evidence that a DDP is "totally without capacity to care for himself or herself or the respondent's estate," the probate court is required to appoint a "plenary guardian." MCL 330.1618(5); MSA 14.800(618)(5).

Subsection 631(1) provides that a plenary guardian "shall have," among others, the following duties:

> (a) Custody of the ward.
>
> (b) The duty to make provision from the ward's estate or other sources, for the ward's care, comfort, and maintenance.
>
> (c) *The duty to make a reasonable effort to secure for the ward* training, education, *medical,* and psychological *services,* and social and vocational opportunity *as are appropriate and as will assist the ward in the development of maximum self-reliance and independence.* [MCL 330.1631(1); MSA 14.800(631)(1). Emphasis added.]

Although § 631 neither expressly provides for nor prohibits a guardian's consent to sterilization of a ward where appropriate, the term sterilization is found in § 629, which provides in pertinent part:

(1) A guardian . . . shall not be liable for civil damages by reason of authorizing routine or emergency medical treatment or surgery *or extraordinary procedures when previously ordered by the court* for his or her ward if the guardian acted after medical consultation with the ward's physician, acted in good faith, was not negligent, and acted within the limits established for the guardian by the court.

(2) A guardian . . . *who has been authorized by the court to give medical consent,* shall not be liable by reason of his or her authorization for injury to the ward resulting from the negligence or other acts of a third person.

(3) Routine medical services do not include extraordinary procedures. *Extraordinary procedures includes* [sic], but is not limited to, *sterilization, including vasectomy,* abortion, organ transplants from the ward to another person, and experimental treatment. [MCL 330.1629; MSA 14.800(629). Emphasis added.]

The majority concludes that probate judges are without authority to authorize a guardian to consent to sterilization of a developmentally disabled ward because such authority would have to be implied from the ambiguous language of § 629 of the Mental Health Code. See MCL 330.1629; MSA 14.800(629). Given the nine-year odyssey of this case through Michigan courts, my judicial colleagues apparently are not alone in their view that the statute is ambiguous; however, I find the statute, read as a whole, to be plain and unambiguous. Nonetheless, an in-depth examination of the Legislature's intent in enacting and amending the

statute resolves this pseudoambiguity and reveals the fundamental error in the majority's decision.

## B

Although the majority touches on the history of sterilization of the developmentally disabled and mentally ill in this country, further examination of this complex and troubled history is necessary to appreciate current legislative pronouncements. Early in this century, many states enacted compulsory eugenic[2] sterilization statutes under the guise of protecting and promoting the general health and welfare of society as well as the public fisc. See, generally, *In re Grady,* 85 NJ 235, 245-248; 426 A2d 467 (1981); anno: *Jurisdiction of court to permit sterilization of mentally defective person in absence of specific statutory authority,* 74 ALR3d 1210, § 2a. One such statute in Virginia was upheld by the United States Supreme Court in *Buck v Bell,* 274 US 200, 207; 47 S Ct 584; 71 L Ed 1000 (1927), which concluded that compulsory sterilization of an institutionalized "feeble-minded" eighteen-year-old woman as an alternative to "waiting to execute degenerate offspring for crime" did not offend the Fourteenth Amendment Due Process Clause. Justice Holmes, noting that the woman's "feeble minded" mother and "illegitimate feeble minded" daughter were in the same institution, declared: "Three generations of imbeciles are enough." *Id.* at 205, 207.

In Michigan, three former statutes dealt with involuntary, eugenic sterilization.[3] The first was

---

[2] Eugenics is the study of human improvement by genetic control. *The Random House College Dictionary: Revised Edition* (1984).

[3] Michigan has the distinction of being the first state to attempt to enact eugenic sterilization legislation. A bill was introduced in 1897 proposing the use of sterilization to prevent "idiocy," but was defeated. See Brakel, *The Mentally Disabled and the Law* (3d ed, 1985), p 522.

enacted in 1913 and authorized the sterilization by surgical operation of "mentally defective persons" maintained wholly or in part by public expense in public institutions. See 1913 PA 34, as codified at 1915 CL 5176 *et seq.* That act was declared unconstitutional because it arbitrarily applied only to people confined in public institutions and therefore represented "capricious and discriminating class legislation." *Haynes v Lapeer Circuit Judge,* 201 Mich 138, 141, 145; 166 NW 938 (1918).[4]

In an apparent attempt to cure the constitutional defect in 1913 PA 34, the Legislature enacted 1923 PA 285, simply authorizing "the sterilization of mentally defective persons." Two years later, the Michigan Supreme Court upheld the statute against a challenge to its constitutionality, relying on extant medical opinion that "science has demonstrated to a reasonable degree of certainty that feeble-mindedness is hereditary." *Smith v Wayne Probate Judge,* 231 Mich 409, 414-415; 204 NW 140 (1925).

In the wake of *Buck v Bell,* the third statute was enacted in 1929, repealing the 1923 act. The new statute was intended "to prevent the procreation of feeble-minded, insane and epileptic persons, idiots, imbeciles, moral degenerates, and sexual perverts, likely to become a menace to society or wards of the state." 1929 PA 281, MCL 720.301 *et seq.*; MSA 14.381 *et seq.* This act was repealed with passage of the revised Mental Health Code in 1974 PA 258, which contained no mention of sterilization at that time.

During the mid to late 1970s, Michigan, as well as many other states, abandoned the practice of compulsory eugenic sterilization by repealing enabling statutes. This shift resulted from a coales-

[4] The act was subsequently repealed by 1944 (Ex Sess) PA 29.

cence of social, political, and legal forces, including many eugenic-based sterilization theories being discredited, the developmentally disabled and mentally ill being deinstitutionalized and reintegrated into society, and recognition that these individuals enjoyed the same fundamental rights of privacy, due process, and equal protection of law as other citizens. See, generally, *In re Grady, supra; In re Hayes,* 93 Wash 2d 228; 608 P2d 635 (1980).

Soon after the revised MHC was enacted in 1974, it became evident that, despite the great need for persons to act as guardians for the developmentally disabled, people were reluctant to do so for fear of becoming involved in litigation after authorizing treatment for their ward. House Legislative Analysis, HB 4228, First Analysis, May 2, 1977. House Bill 4228 was thereafter introduced, evincing a two-fold purpose: to clarify the authority of a guardian to consent to treatment for a ward and to provide for the guardian's immunity under certain circumstances. As originally introduced, House Bill 4228 provided as follows:

> Sec. 629. (1) THE GUARDIAN FOR THE CARE AND CUSTODY OF THE PERSON MAY AUTHORIZE MEDICAL, SURGICAL, AND OTHER PROFESSIONAL CARE, TREATMENT AND ADVICE FOR HIS WARD.
>
> (2) A GUARDIAN SHALL NOT BE LIABLE BY REASON OF HIS AUTHORIZATION FOR INJURY TO THE WARD RESULTING FROM THE NEGLIGENCE OR OTHER ACTS OF A THIRD PERSON.
>
> (3) A GUARDIAN, LIMITED GUARDIAN, PLENARY, OR PARTIAL GUARDIAN SHALL NOT BE LIABLE FOR DAMAGES BY REASON OF AUTHORIZING MEDICAL TREATMENT OR SURGERY FOR HIS WARD IF THE GUARDIAN ACTED AFTER MEDICAL CONSULTATION WITH THE WARD'S PHYSICIAN, ACTED IN GOOD FAITH, AND WAS NOT GROSSLY NEGLIGENT.

Following introduction of HB 4228, various state

agencies responded with suggested changes to the bill. Notably, the Department of Social Services found subsection 1 overly broad:

> The Legislature, if it passes this statute in its present form, would confer the power to authorize care on any guardian . . . thereby bypassing a court's finding of fact in a particular case with respect to the ability of the mentally retarded person to make such decisions for him or herself. It fails to recognize that the mental health code discourages the appointment of plenary . . . guardianship and encourages partial guardianship thereby allowing the retarded person as much decision-making as he/she can handle. . . . Consequently, it might be wiser for the Legislature to first require that all orders for partial guardianship address the question of authorization so that that issue would be clear one way or the other. [Department of Social Services, Analysis of HB 4228, May 17, 1977, p 2, ¶ 7.]

Moreover, the Department of Attorney General, in summarizing the arguments against HB 4228, stated that the proposed amendment was "unnecessary because the guardian already has the power to consent to such procedures and has sufficient protection from liability under current case law." Department of Attorney General, Analysis of HB 4228, May 13, 1977, p 2, ¶ 8(c).

These criticisms of HB 4228 appear to have been the catalyst that ultimately led the Legislature to shift the focus away from ascribing all-inclusive authority to a guardian—whether plenary or partial—to consent to medical treatment for a ward.[5] Nevertheless, as enacted, § 629 recognized a guard-

---

[5] The minutes of the meeting of the House Committee on Mental Health on April 28, 1977, reflect that Representative David Hollister, chairman of the committee, mentioned "meeting with the Bar in order to develop guidelines to shift the focus to limited rather than full guardianships."

ian's authority to consent to medical treatment but circumscribed that authority in accordance with the statute's declared preference for partial guardianships and the court's responsibility to delineate a guardian's specific duties. See MCL 330.1602(2), 330.1620, 330.1631(1); MSA 14.800(602)(2), 14.800(620), 14.800(631)(1).

Following introduction, HB 4228 was referred to the House Committee on Mental Health where certain amendments were proposed, including a provision declaring that § 629 "shall not be construed to permit the guardian to authorize sterilization, abortion, psychosurgery, experimental surgery or electroshock treatment." 1977 Journal of the House 1000. The House of Representatives passed the bill as amended and sent it to the Senate, where a substitute for HB 4228 was passed that did *not* contain the above limiting provision. 1977 Journal of the Senate 1112, 1186, 1202; House Legislative Analysis, HB 4228, Second Analysis, July 11, 1977. This change in language is subject to two interpretations. On the one hand, it could be construed as the Legislature's admonition that sterilization may be an appropriate and necessary medical procedure in certain situations. On the other hand, because the power of probate judges is circumscribed by law, the change could be construed as the Legislature's recognition that simply not mentioning the term sterilization would operate to deprive probate judges of the power to adjudicate sterilization petitions. Research into this issue has not revealed which of these views prevailed.[6]

---

[6] At the trial in this matter, Dohn Hoyle, executive director of the Washtenaw Association for Retarded Citizens and chairman of the ethics and advisory council of the University of Michigan Model Clinic for the Reproductive Health Concerns of the Mentally Handicapped, testified that he had participated in the drafting of Chapter 6 of the Mental Health Code in the early 1970s. At that time, he took a

Nonetheless, as originally enacted on July 27, 1977, § 629 made no mention of extraordinary medical procedures or sterilization, but provided as follows:

> (1) A guardian, temporary guardian, plenary, or partial guardian shall not be liable for civil damages by reason of authorizing medical treatment or surgery for his or her ward if the guardian acted after medical consultation with the ward's physician, acted in good faith, was not negligent, and acted within the limits established for the guardian by the court.
>
> (2) A guardian, temporary guardian, plenary, or partial guardian who has been authorized by the court to give medical consent, shall not be liable by reason of his or her authorization for injury to the ward resulting from the negligence or other acts of a third person. [MCL 330.1629; MSA 14.800(629).]

In its next session, the Legislature comprehensively amended Chapter 6 of the MHC to expand the guidelines for appointment of guardians, to clarify a guardian's duties and responsibilities, and to promote and protect the procedural due process

"strong stand" favoring enactment of a statute prohibiting guardians from consenting to sterilization of their wards. Hoyle reasoned that such a prohibition did not constitute arbitrary discrimination against the developmentally disabled but rather protected them from having another person's wishes imposed on them.

Interestingly, Hoyle testified that Ms. Wirsing's case had been anonymously presented to the model clinic's advisory council and the "consensus of opinion" was that sterilization was inappropriate. On cross-examination, it was revealed that the information presented to the council was incomplete and that the council had *never* recommended sterilization in a case where the patient was unable to provide informed consent. Hoyle testified that, where a patient is unable to provide informed consent, it is best to "err[] on the correct side" by refusing to authorize consent by a parent or guardian. Acknowledging the troubled history concerning sterilization of DDPs, Hoyle stated: "I certainly like where the . . . pendulum has swung to as opposed to where it had been before and I have no desire to see it go back."

interests of DDPS. Importantly, § 631 was added,
setting forth the duties of guardians, and § 629
was amended to include the phrase "or extraordi-
nary procedures when previously ordered by the
court," and to define sterilization as an "[e]xtraor-
dinary procedure."[7] 1978 PA 527.

The reasons for amending § 629 cannot be dis-
cerned from the legislative record, but the 1977
and 1978 amendments as a whole denote a further
refinement of the forces that precipitated revision
of the MHC in 1974.[8] These amendments were
spurred in part by a federal funding act intended
by Congress to provide federal guidelines, mandate
planning, and appropriate funds to states that
implemented improved services for the develop-
mentally disabled and the mentally impaired. See
The Developmental Disabilities Assistance and Bill
of Rights Act, 42 USC 6001 et seq.[9] In an effort to
coordinate and improve services to the develop-
mentally disabled, our state Legislature adopted
many of the federal guidelines and mandates.[10]

Michigan's repudiation of the last remnants of
involuntary eugenic sterilization, by enactment of
the revised MHC in 1974 and the amendments in

---

[7] These particular amendments of § 629 were initially proposed as
additions to HB 5713 after it was presented to the Senate Committee
on Health, Social Services, and Retirement. 1978 Journal of the
Senate 2098.

[8] Contrary to the majority's claim, there is no basis to "speculate"
that the Legislature intended the phrase "extraordinary procedures
when previously ordered by the court" to provide immunity only for
guardians who consented to have their ward sterilized under the
repealed eugenic sterilization statutes. Such a strained interpretation
of the statute is wholly without support in the legislative record.

[9] In fact, federal funding was conditioned on each state establishing
an agency to protect and advocate the individual rights of persons
with developmental disabilities. The intervenor-appellant, Michigan
Protection and Advocacy Service, constitutes this state's designated
protection and advocacy system. See MCL 330.1931; MSA 14.800(931).

[10] See Senate Special Committee to Study the Problems and Needs
of Adults with Developmental Disabilities, Report to the Michigan
78th Legislature (December 15, 1976).

1977 and 1978, reflected the emerging modern approach toward the developmentally disabled, i.e., to provide a DDP with a guardian, generally a family member, who would have broad, yet specified, authority to secure medical and other professional treatment on behalf of and in the ward's best interest. This, of course, is distinct from the authority vested in directors of public institutions under the former eugenic-based statutes to have patients sterilized in furtherance of an overriding concern for society's health and welfare. In other words, there is a marked distinction between sterilization ordered by the *state* for genetic control purposes and medical treatment sought by a familial guardian to assist the ward in attaining the ward's maximum independence. Disavowing this important distinction, the majority turns back the clock and places a DDP's reproductive life under the thumb of the state.

This exhaustive historical analysis leaves no room for doubt that the genesis of § 629 was the Legislature's intent to provide "a statutory vehicle for obtaining substitute consent"[11] for certain medical procedures, and to ensure immunity of guardians who act after consultation with the ward's physician, act nonnegligently and in good faith, and procure probate court authorization for such procedures. Consonant with this state's established public policy to promote and protect the well-being of DDPs, including protection from exploitation and abuse, and to maximize a DDP's self-reliance and independence, the Legislature intended the provisions of § 629 to augment and sharpen a guardian's duty under § 631 to make a reasonable effort to secure appropriate medical services for the ward, including the full range of reproductive and

---

[11] Department of Attorney General, Analysis of HB 4228, May 13, 1977, p 1, ¶ 7.

contraceptive choices. Consequently, read together, §§ 629 and 631 permit a probate judge to authorize a guardian to consent to sterilization of a developmentally disabled ward.

II

Significantly, the majority's strained reading of §§ 629 and 631, notwithstanding the clear intent of the Legislature, renders the statute unconstitutional as an impermissible infringement of a DDP's right to privacy, equal protection, and due process.

Competent persons possess a fundamental interest in procreative choice, incident to their right of privacy. See *Skinner v Oklahoma,* 316 US 535; 62 S Ct 1110 ; 86 L Ed 1655 (1942) (fundamental right to marry and procreate); *Griswold v Connecticut,* 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965) (right to privacy encompasses contraceptive use and counseling for married persons); *Eisenstadt v Baird,* 405 US 438; 92 S Ct 1029; 31 L Ed 2d 349 (1972) (extending *Griswold* to unmarried individuals); *Roe v Wade,* 410 US 113; 93 S Ct 705 ; 35 L Ed 2d 147 (1973) (fundamental right to decide whether to terminate a pregnancy). Thus, while a woman clearly has the right to choose to bear children, she also has a corresponding right to choose not to bear children and to implement that choice by the use of contraceptive devices or treatment, and, subject to reasonable restrictions, by the termination of a pregnancy.

Intervenor-appellant, the Michigan Protection and Advocacy Service, contends that because Lora Faye Wirsing is unable to make this important choice for herself, any decision made by her guardian on her behalf would render the sterilization procedure nonconsensual and involuntary, and therefore violate her right to privacy and bodily

integrity. I disagree with this contention. Lora
Faye Wirsing has no less interest in the maximum
development of her self-reliance and independence
through procreative choice than a competent
woman.

> [A developmentally disabled woman] has the
> same constitutional right of privacy as anyone else
> to choose whether or not to undergo sterilization.
> Unfortunately, she lacks the ability to make that
> choice for herself. We do not pretend that the
> choice of her parents, her guardian *ad litem,* or a
> court is her own choice. But it is a genuine choice
> nevertheless—one designed to further the same
> interests she might pursue had she the ability to
> decide herself. We believe that having the choice
> made in her behalf produces a more just and
> compassionate result than leaving [her] with no
> way of exercising a constitutional right. Our Court
> should accept the responsibility of providing her
> with a choice to compensate for her inability to
> exercise personally an important constitutional
> right. [*In re Grady, supra* at 261.]

See also *In re Terwilliger,* 304 Pa Super 553, 562-
563, n 1; 450 A2d 1376 (1982).

Michigan appellate courts have embraced, in the
context of the right to withdraw life-sustaining
medical treatment, surrogate decision making on
behalf of incompetent persons, guided by certain
procedural safeguards to ensure due process of
law. *In re Martin,* 450 Mich 204; 538 NW2d 399
(1995);[12] *In re Rosebush,* 195 Mich App 675; 491
NW2d 633 (1992). See also *Cruzan v Director,*

---

[12] The Supreme Court held that surrogate decision making by way
of a purely subjective standard was appropriate where a formerly
competent patient had expressed wishes regarding the withdrawal of
life-sustaining treatment. The Court expressly reserved for another
day the issue of surrogate decision making for persons who had never
been competent, noting, however, that under such circumstances "a
more objective approach may be necessary and appropriate." *In re
Martin, supra* at 223, n 15.

*Missouri Dep't of Health,* 497 US 261, 289-292; 110
S Ct 2841; 111 L Ed 2d 224 (1990) (O'Connor, J.,
concurring). Similarly, courts in other jurisdictions
have held that a properly designated surrogate
may consent to sterilization of a developmentally
disabled ward where the procedure is determined
to be in the ward's best interest. *In re Grady,
supra; In re A W,* 637 P2d 366 (Colo, 1981). Thus,
an incompetent person does not forfeit basic con-
stitutional rights merely because the person is
unable to exercise those rights in a cognizant and
meaningful manner. *Rosebush, supra* at 681-682.

A statutory classification that infringes on a
person's exercise of a fundamental right must be
justified by a compelling state interest and
achieved by narrowly drawn means. *Carey v Popu-
lation Services Int'l,* 431 US 678; 97 S Ct 2010; 52
L Ed 2d 675 (1977); *Roe, supra* at 155. To construe
Chapter 6 of the mhc, as the majority has, as
precluding a probate judge from authorizing a
guardian to consent to sterilization of a ward will
result in the complete interdiction of nontherapeu-
tic or contraceptive sterilization procedures for the
developmentally disabled who are unable to pro-
vide informed consent.[13] Such an insurmountable
obstacle to the exercise of a fundamental right
cannot plausibly be argued to be narrowly tailored
to further the state's interest espoused in Chapter
6 of the mhc, i.e., to promote and protect the well-
being of ddps and to maximize their self-reliance
and independence. Indeed, barring access to a safe
and reliable method of contraception will severely
hamper the ability of some ddps to live in a less
restrictive environment.[14]

---

[13] Notably, the probate judge in this case found that no physician
would perform a sterilization and no hospital would allow Lora Faye
Wirsing (or any other ddp) to be sterilized without a court order.

[14] At the trial in this matter, Sally Kope, a social worker at the

Moreover, such a statutory prohibition sweeps too broadly and creates an arbitrary class distinction by restricting an individual's exercise of a constitutional right merely because that person is developmentally disabled. See *In re Valerie N,* 40 Cal 3d 143; 707 P2d 760 (1985) (striking down a statute that prohibited all nontherapeutic sterilization procedures for developmentally disabled persons); *In re Moe,* 385 Mass 555; 432 NE2d 712 (1982).

Accordingly, the majority's interpretation of Chapter 6 of the MHC denies an incompetent developmentally disabled person the same right to procreative choice that is accorded to a competent person, violating state and federal constitutional guarantees of privacy, equal protection, and due process. *In re Valerie N, supra.* In light of well-established rules of statutory construction that preclude construing a statute so as to invalidate it, *House Speaker v Governor,* 443 Mich 560, 585; 506 NW2d 190 (1993), I find it irrefutable that §§ 629 and 631 provide authority to probate judges to authorize a guardian's consent to sterilization of a developmentally disabled ward.

III

In support of its position, the majority asserts that the MHC lacks "adequate safeguards . . . to assure that the ward has the guarantee of due process." *Ante* at 137-138. A thorough reading of the statute dispels any such claim.

Under the provisions of Chapter 6 of the MHC, once an individual is adjudged to be developmentally disabled and the need for appointment of a

University of Michigan Model Clinic and an expert in the sexuality of developmentally disabled persons, testified that the rate of sexual abuse of DDPs is "astronomical," rising above fifty percent.

guardian is established, the probate court is required to determine whether the guardianship should be plenary or partial. MCL 330.1618; MSA 14.800(618). Where a partial guardianship is established, the court must define in its order the powers and duties of the guardian and must specify all legal disabilities of the ward. MCL 330.1620; MSA 14.800(620). Where the court finds that the ward is "totally without capacity to care for himself or herself," MCL 330.1618(5); MSA 14.800(618) (5), it must establish a plenary guardianship, granting the guardian "the legal rights and powers of a full guardian," MCL 330.1600(i); MSA 14.800(600)(i).

Pursuant to § 631, the court should expressly circumscribe the scope of duties of a guardian—whether plenary or partial—in its guardianship order. When the court is presented with a petition to modify an existing guardianship order, § 637 provides for certain procedural safeguards, including a hearing conducted in accordance with §§ 615 and 617. Under these sections, the DDP is entitled, among other things, to be represented by counsel, to an independent evaluation by a physician or psychologist, and to an adversarial hearing before a jury where the petitioner has the burden of establishing, by clear and convincing evidence, that sterilization is in the ward's best interest. See MCL 330.1618(4), (5); MSA 14.800(618)(4), (5) (applying clear and convincing evidence standard); accord *In re Martin, supra* at 218-219, 227, ns 12, 22. These statutory safeguards are sufficient to allow the statute to pass constitutional muster.[15]

[15] Given that sterilization implicates an individual's fundamental interests in procreative choice and privacy, and the fact that many DDPs are sufficiently competent to make an informed decision regarding this issue, further guidelines may be appropriate to assist probate judges in adjudicating these important rights. Incorporating decision-making guidelines set forth by courts in other jurisdictions, I would

CONCLUSION

Sections 629 and 631 of the MHC unambiguously provide statutory authority to a probate judge to authorize a guardian to consent to sterilization of a developmentally disabled ward. The due process interests of a DDP in such a proceeding are protected by the procedural safeguards set forth in the MHC. These conclusions are wholly consistent with the Legislature's intent in enacting and amending the revised MHC, and they advance the established important public policy of this state to accord due process and equal protection of the law to all Michigan citizens, including the developmentally disabled.

---

adopt the following nonexhaustive list of factors to assist a trier of fact in determining whether sterilization is in a ward's best interest:

(1) If possible, the individual's understanding and desire for the proposed procedure and its consequences;

(2) Any medical necessity for the procedure;

(3) The physical ability of the individual to procreate;

(4) The likelihood that the individual will engage in sexual relations, either voluntarily or involuntarily;

(5) The individual's degree of understanding of reproduction and contraception;

(6) The realistic existence of other less invasive means of contraception;

(7) Whether the individual would be able to parent a child;

(8) The age, educability, and trainability of the individual;

(9) The psychological or traumatic health risks associated with the sterilization procedure; and

(10) Whether the sterilization procedure is being sought in good faith by the guardian.

See *In re Hayes, supra* at 235-239; *In re Grady, supra* at 263-267; *In re CDM,* 627 P2d 607, 612-613 (Alas, 1981); *In re Terwilliger, supra* at 563-568; *In re C W,* 433 Pa Super 167; 640 A2d 427 (1994), cert den sub nom *C W v Wasiek,* — US —; 115 S Ct 1175; 130 L Ed 2d 1127 (1995).