# In re Easly

C.P. of Venango County, no. 959-1999.

*Howard Ulan, senior assistant counsel,* for Department of Public Welfare.

*Michael Pribanic,* for guardian.

*Guy Vilim,* for intervenor Northwest Human Services.

*Virginia G. Sharp,* court-appointed guardian ad litem for Ruth Easly.

WHITE, *P.J.,* April 12, 2000—In adjudicating this matter, we have broken down our adjudication into procedural history, a discussion of the authorities which the court has considered, a discussion of the evidence, and the findings of fact and conclusions.[1]

## I. PROCEDURAL HISTORY

Ruth Easly was born on December 2, 1927. Until her admission in 1942, at the age of 14, to Polk Center, she

---

1. As an aside, we thank all counsel for excellent expositions of the issues and evidence, but especially Mr. Ulan and Mr. Pribanic. Mr. Ulan, as counsel for the Commonwealth, helped us enormously on the law. His knowledge and experience with Pennsylvania Mental Health, Mental Retardation Law must be unparalleled. I hope someday he writes a legal treatise for use by lawyers and judges on this topic. Mr. Pribanic, considering his competent presentation of this case, and his unwavering commitment to the cause of the severely mentally retarded, makes one again proud to be part of the legal profession.

resided with her family in Hastings, Cambria County, Pennsylvania.

The Commonwealth had, pursuant to its plan for compliance with the Americans with Disabilities Act of 1990, 42 U.S.C. §12132, ADA, began out-processing from institutional settings, such as Polk, patients who the health care professionals determined could function in a community setting. The staff at Polk Center, as part of a team, concluded that Ruth Easly could function appropriately in a community group home, and began planning same. Dialogue was open with Ruth Easly's family; however, the family opposed Ruth Easly being removed from Polk Center. Stephen Dvorchak, in 1998, petitioned the Court of Common Pleas of Venango County, the county where Polk Center is located, to be appointed plenary guardian of the person and estate of Ruth Easly and, on July 6, 1998, the court, after hearing, concluded that Ruth Easly was incapacitated, that a plenary guardian of her person and estate should be appointed and Stephen Dvorchak, her nephew, was appointed as plenary guardian.

Ruth Easly, though 72 years old, functions within the profound range of mental retardation. Ruth Easly suffered a "mechanical injury" at birth. She can walk but does suffer several somewhat debilitating medical problems such as hiatal hernia, which causes her chest pains, hypercholesterolemia, scalp seborrhea and asteotosis. She is on medication, including Carafte, skin lotion and Mevacor, for her hypercholesterolemia. Ruth Easly has a communication age equivalent to 1 year, 10 months, and daily living skills equivalent to 2 years, 8 months. She has a socialization age of 1 year, 6 months, and a mental age of 2 years, 1 month, with an IQ of 14.

So far as we can determine from our record, no court proceeding had been initiated to place Ruth Easly at Polk

Center. When she was committed at age 14, her parents would have had the authority to commit her as a voluntary commitment. The professional staff at Polk Center, and Cambria County MH/MR administration and the Cambrian Hills Center (a community-based residential facility), collectively determined that community placement in Cambria County would be in Ruth Easly's best interests.

Pursuant to section 4419 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4419, the 1966 MH/MR Act, the facility director at Polk Center authorized a leave from Polk Center to Cambrian Hills Center at Plain Road, Portage, Pennsylvania, in Cambria County, as a trial visit. Cambrian Hills is owned and operated by Northwestern Human Services of Pennsylvania Inc.

The petitioner contends the trial visit was successful and the plan was to discharge Ruth Easly from Polk Center; however, the discharge was delayed temporarily to permit continued prescription services through Polk Center. Ruth Easly's guardian vigorously opposed placement at Cambrian Hills and threatened litigation. Cambria County, through its MH/MR, concluded that there were issues concerning whether Ruth Easly had been improperly placed at Cambrian Hills and at the guardian's insistence, on May 18, 1999, returned Ruth Easly from the group home in Portage to Polk Center.

On May 24, 1999, Nancy Thaler, deputy secretary for mental retardation, filed the petition for mental retardation commitment with the Commonwealth Court, requesting the Commonwealth Court to exercise original jurisdiction. Petitioner alleged that Ruth Easly had been admitted to Polk Center from Cambria County, so there was some argument for jurisdiction in Cambria County,

and Ruth Easly had lived at Polk Center from 1942 to 1999 and, therefore, there was some argument that Venango County had jurisdiction. The petition requested the Commonwealth Court exercise original jurisdiction. Mr. Dvorchak, as guardian, filed preliminary objections challenging venue and jurisdiction and, on June 8, 1999, the Commonwealth Court entered a memorandum and order wherein it concluded that in the interest of judicial economy, the matter should be transferred to Venango County Court of Common Pleas where Ruth Easly had resided for 57 years. On June 17, this judge filed an order setting a pre-hearing conference for June 28, 1999. We appointed Virginia Sharp, Esquire, as guardian ad litem for Ruth Easly. We solicited pre-hearing statements from counsel. Pre-hearing statements were filed by all counsel. The pre-hearing conference was conducted on June 28, 1999. This court filed an order scheduling the matter for two full days of trial on August 23 and August 24, 1999. Also, in that order, we granted Northwestern leave to join in the proceedings but in a qualified manner. Not wanting to complicate the proceedings by increasing the number of parties and counsel, but wanting the benefit of any input from Northwestern, we allowed Northwestern to participate in the proceedings by filing briefs and arguments, but to participate in the hearing only as counsel associated with the petitioner. At the pre-hearing conference, counsel agreed that the court would be ultimately required to decide:

"[W]hether the Commonwealth is required, when it changes placement of a person, such as Ruth Easly, from Polk Center to a community facility, whether it is required to use administrative procedure and afford the family or guardian a hearing under the Administrative

Procedures Hearings and Appeal Administrative Procedures Act under 55 Pa. Code. Counsel for the guardian contends the Commonwealth could not make this move without first initiating the process. Counsel for the Commonwealth contends that the Commonwealth has the authority to make the move without hearing and, in fact, the Commonwealth should not be required, as it has done in this case, to file a petition under the Mental Health and Mental Retardation Act of 1966." Order of June 28, 1999.

Counsel then did proceed to discovery. The court was required to make a few discovery orders, although counsel generally cooperated in good faith with one another to get the case ready for the hearing. Two full days of testimony were received by the court on August 23 and August 24. It was agreed and stated in the pretrial order of June 28, 1999 that the court would visit Ruth Easly in her present living environment after the conclusion of the testimony. This judge did then visit Ruth Easly at Polk Center on August 26, 1999. We dictated our observations in a memorandum. (Court exhibit 2.) As I was leaving Polk Center, I was handed a letter by one of the staff at the facility; the circumstances of receiving the letter are noted in court exhibit 2.

The court had planned to hear arguments from counsel on August 30; however, because of the note that was received by this judge and transmitted to counsel, counsel for the guardian asked to reopen the record and this court did, at the hearing on August 30, authorize the record to be reopened. The court then received additional testimony on September 14. We also received closing arguments of counsel at that time. Altogether, the court received testimony from eight witnesses called by the

petitioner and 10 witnesses called by the respondent. The court considered five exhibits submitted by the petitioner, seven exhibits submitted by the guardian, two exhibits submitted by the guardian ad litem and two court exhibits. We have added court exhibit 3, which is a letter from Owen M. Sullivan, Esquire, who is county solicitor for the County of Cambria, and the attachments to the letter, and we note that Owen Sullivan was a witness in this proceeding, testifying by telephone conference call on behalf of the guardian. The court also received on August 27 from Guy Vilim, Esquire, as counsel for Northwestern, the collective bargaining agreement relating to employees at Cambrian Hills, which we have included in the record with the exhibits in this proceeding. Counsel for the Commonwealth, on October 5, 1999, submitted the memorandum opinion of the Honorable William L. Standish, United States district judge for the Western District of Pennsylvania, which was filed in *Richard C. by Kathy B. v. Houstoun,* civil action no. 89-2038 (W.D. Pa. September 29, 1999), and counsel for the guardian submitted the opinion of the Honorable Jeannine Turgeon, *In re Bear,* 44 D.&C.4th 225 (Dauphin Cty. 1999).

At the commencement of the hearing in this matter, counsel for the guardian reminded this judge that he had asserted preliminary objections to the use of a petition under section 4406 of the 1966 MH/MR Act. This judge told counsel we would proceed with the hearing and address the preliminary objections later. We state, at this point, that we conclude the matter should be determined on its merits, and the preliminary objections, we conclude, are subsumed in our disposition of the case on the merits.

## II. AUTHORITIES CONSIDERED

The petition is brought under section 406 of the 1966 MH/MR Act. That section provides in pertinent part:

"Civil court commitment

"(a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

"(1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person.

"(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

"In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director." 1966 MH/MR Act, §406.

In 1976, in *Goldy v. Beal,* 429 F. Supp. 640, 649 (M.D. Pa. 1976), the federal district court enjoined the use of section 406 for commitment to state facilities on grounds

of vagueness. The court later stayed its injunction and permitted use of section 406 subject to conditions which are codified at 55 Pa. Code, chapter 6250. See note 1 in petitioner's pre-hearing statement. It was noted that the Commonwealth Court has stated that the Mental Health Procedures Act of 1976 and the MH/MR Act of 1966 are to be read in pari materia. *In re Steinhiser,* 56 Pa. Commw. 349, 424 A.2d 1006 (1981); see the memorandum and order filed by the Commonwealth Court in this proceeding on June 7, 1999. At the time Ruth Easly was committed, she was 14. Apparently, no formal proceedings were ever brought in this matter and under the 1966 Act, a person over the age of 18 could voluntarily commit oneself and a person under the age of 18 could be voluntarily committed by a parent or guardian. 1966 MH/MR Act, §4403. It would seem, therefore, a fair reading of the Act and of the cases would indicate that a person over 18 who is incapacitated could not be voluntarily committed. This appears to be the thrust of section 5521 of the Incapacitated Persons Act, 20 Pa.C.S. §5521, where the statute recites that the court may not give a guardian powers that are controlled by other statutes to admit an incapacitated person to an inpatient psychiatric facility or state center for the mentally retarded. Therefore, it does appear that the only vehicle available to involuntarily place Ruth Easly would be section 406 of the MH/MR Act of 1966. There was some discussion and argument by counsel about the applicability of the Older Adults Protective Services Act, 35 P.S. §10211 et seq., which Act essentially permits public agencies, such as the Area Agency on Aging in Venango County, to petition, initially on an emergency basis and then, if necessary, on an extended basis, for the care of older adults.

Clearly, Ruth Easly is an older adult. Therefore, in Ruth Easly's case, the petition could have been brought under section 10220 of the Older Adults Act. Nevertheless, we do find that section 406 of the Mental Health/Mental Retardation Act of 1966 provides a proper vehicle to dispose of the issues presented.

Both nationally and in Pennsylvania, there has been a movement away from institutionalization of mentally retarded persons. The number of mentally retarded Pennsylvanians in institutions has decreased from 13,470 in 1966 to 2,478 by June of 1988. See note 10 in *In re Bear,* 44 D.&C.4th at 244 n.10; *In re Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981). The Pennsylvania Supreme Court described normalization:

"The concept of normalization envisions that the mentally retarded person and his or her family shall have the right to live a life as close as possible to that which is typical for the general population. *Consistent with this concept is the requirement that the least restriction consistent with adequate treatment or required care shall be employed." Id.* at 96, 429 A.2d at 636 (emphasis added); see also, 55 Pa. Code §6350.11. Judge Standish's opinion in his memorandum and order filed on September 22, 1999, relating to the status of Western Center in Pennsylvania, provides a good analysis of how the issue of "outplacement" has been a contentious matter in the Commonwealth since at least 1989. In his analysis of *Richard C., by Kathy B. v. Houstoun, supra* at note 5, he notes the legislative action with regard to outplacement and a reduction of inpatients within the facilities. From Judge Standish's opinion, we glean that after a settlement agreement was entered, Western Center's population had been reduced from 384 class members to 98 as

of January 15, 1999. *Id.* at 13. The staff at Western had been reduced. Parts of the facility had been closed. Judge Standish ultimately concluded that the parties in the instant action, as parents of the residents and as guardians who attempted to intervene in the class action which was forcing the closing of Western, could not intervene because of the delay of five and one-half years since the beginning of implementation of the settlement agreement. He concluded that the opinion in *Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), *on remand, L.C. v. Olmstead,* 198 F.3d 1259 (11th Cir. (Ga.) 1999), which we will discuss later, had not sufficiently changed the status of the situation to warrant allowing intervention. We conclude that while the federal court opinion is useful, especially in construing the Americans with Disabilities Act and the *Olmstead* opinion, it does not have much bearing on this case because this case involves just one individual, Ruth Easly, and ultimately a determination of who, and by what method, a decision should be made as to where she will be cared for.

Fortunately, for this judge, the Americans with Disabilities Act has been thoroughly explained by our United States Supreme Court in *Olmstead, supra.* In *Olmstead,* two mentally disabled patients brought a civil rights suit against the State of Georgia, challenging their confinement in an institution. The United States District Court granted partial summary judgment. Georgia appealed and the United States Court of Appeals affirmed but remanded with some instructions. The matter then was appealed to the United States Supreme Court. Our Supreme Court told us, "Unjustified isolation, we hold, is properly regarded as discrimination based on disability." *Id.* at 2185. The court then further stated:

"Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination and reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that the persons so isolated are incapable or unworthy of participating in community life . . . Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 2187.

Therefore, under any analysis, *Olmstead* makes it clear that persons should not be in institutional isolation unjustifiably. The court then concluded that the state should be able to rely upon the assessments of its professionals when determining whether an individual meets the essential eligibility requirements for habitation in a community-based program and, absent such qualification, whether the patient should be removed to a more restrictive setting. However, the court also stated:

"Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it. Persons with disabilities must be provided the option of declining to accept a particular accommodation." *Id.* at 2188.

In the *Olmstead* case, the state, at one point, had considered moving one of the mentally ill patients, who was the subject of the litigation, into a homeless shelter. The court noted that for some people, no placement outside of an institution may ever be appropriate. The court seemed to adopt positions stated by the American Psychiatric Society:

"Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times—perhaps in

the short run, perhaps in the long run—for the risks and exposure of the less protective environment of community settings. For these persons, institutional settings are needed and must remain available. Each disabled person is entitled to treatment in the most integrated setting possible for that person—recognizing that, on a case by case basis, that setting may be in an institution." *Id.* at 2189.

Significantly, the Commonwealth, in its brief, has told us that Ruth Easly's move from Polk Center to Cambrian Hills would not result in any change of the *level* of care but only a change in the *location* of care. Petitioner's pre-hearing brief at 7.

Counsel for the guardian has vigorously argued that chapter 275 of title 55 of the Pennsylvania Code and Office of Mental Retardation's bulletins establish a right for the guardian of Ruth Easly, as her legal representative, to a hearing before the Department of Public Welfare, Bureau of Hearings and Appeals. This position is supported by the solicitor for Cambria County in his letter to the court which is court exhibit 3 and by his testimony. Significantly, the solicitor, Owen M. Sullivan, Esquire, was a former hearing officer employed by the Department of Public Welfare, and he contends that this whole matter properly belongs before the hearing board as a "perfunctory level of care change case." Court exhibit 3 at 2. The Commonwealth contends, however, that:

"Prior to *Olmstead,* the DPW interpreted the federal regulation so as to permit guardians to effectively block MA—waiver funding of community placement, regardless of professional opinion in favor of it. Pursuant to pre-*Olmstead* policy, Mr. Dvorchak, as Ms. Easly's guardian, had the option of approving or disapproving of MA—funding in the community. He disapproved. Ac-

cordingly, Ms. Easly's care was funded through a state-financed contract with Cambria County without any MA-funding. Having objected to MA-funding in the community—an objection that has been honored—Mr. Dvorchak cannot now complain of the loss of MA-funding. The funding issue has no effect on Ms. Easly in any event, for she did receive in the group home, and would in the future there, receive an ICFMR level of care, albeit state-funded. The gravamen of Mr. Dvorchak's objection is not how Ms. Easly's care is or would be funded, but rather where she receives it. State and federal law, however, deny him control over that. Note 5.

"Note 5. Beneficiary choice policy is currently being reevaluated in light of *Olmstead.* Because of the MA—waiver statute and the ADA are in pari materia—indeed, the *Olmstead* court relied in part on the waiver statute in construing the ADA, *Olmstead* at 36—they must be interpreted harmoniously. . . . *Olmstead's* recognition of the disabled person as the only effective opponent of community placement once the state's professionals recommend it, . . . implies that Mr. Dvorchak's objection to waiver funding cannot require the continued confinement of Ms. Easly at Polk. Neither federal nor state law so empower him. Because the instant matter under 50 P.S. §4406 concerns the location of her care, however, and not funding for it, the court need not reach this issue." Petitioner's pre-hearing brief at 8-9.

If we accept this premise as submitted by counsel for the Commonwealth, once the court has approved the fact that Ruth Easly is in need of involuntary placement, then the decision where she would be cared for would be exclusively the facility director's under sections 4419 and 4420 of the MH/MR Act of 1966 without any right in

the family or the guardian for review. Counsel for the Commonwealth has stated, and *Olmstead* recognizes, the core issue presented in this proceeding is that the disabled person is the only person who can oppose community placement. The dilemma here is, of course, that the disabled person is wholly incapacitated and it is impossible, see our findings hereafter, to determine precisely what Ruth Easly, herself, wants. If the individual has the right to object to community placement, then who speaks for the individual? What is the responsibility of the state institution once a person is determined to be incapacitated, to allow those who may purport to speak on behalf of the incapacitated person to weigh in on the issue with their respective positions? Therefore, the dilemma is to weigh the desires of the family and the guardian against those of the professionals who have evaluated Ruth Easly. The professionals are operating under a mandate by the Department of Welfare to place residents into community group homes, such as Cambrian Hills, and away from institutions such as Polk Center, where the professionals determine that the residents are able to function in such a facility. The position of the Commonwealth in its brief and in this litigation somewhat flies in the face of the policy of the Commonwealth which has heretofore expressed that:

"*Individual Rights*

"*Section 6400.31. Informing and encouraging exercise of rights.*

"(a) Each individual, or the individual's parent, guardian or advocate, if appropriate, shall be informed of the individual's rights upon admission and annually thereafter. . . .

"(c) Each individual shall be encouraged to exercise his rights." 55 Pa. Code §6400.31.

The Commonwealth has told us that because it is not seeking medical assistance that the entitlement to due process that is provided under the waiver program is not pertinent. The guardian ad litem submitted exhibits 1 and 2 which are also attached to the letter to the court from Mr. Sullivan; however, those bulletins do relate specifically to the 2176 waiver program. The question, therefore, for the court is that statement posited by the Supreme Court in *Olmstead,* "Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it." *Olmstead* at 2189. Who speaks for the patient here? How do we resolve a disagreement as to what the patient would want or what is in the patient's best interests between the facility director and the patient's guardian and family?

One does not have to look very far in Pennsylvania jurisprudence to find abundant case law that vests decision-making for persons who are incapacitated in the family. In *In re Fiori,* 543 Pa. 592, 673 A.2d 905 (1996), the Pennsylvania Supreme Court noted that in decisions relating to medical care, that care may not be imposed without the patient's informed consent. Courts have unanimously determined that the right to self-determination does not cease upon the incapacitation of the individual. *In re Fiori* dealt with the issue of Daniel Joseph Fiori, who was in a persistent vegetative state and there was medically no hope of him ever recovering. Mr. Fiori's mother was appointed guardian of his person by court order. The mother requested the nursing home caring for Mr. Fiori to remove his gastrostomy tube. Two physicians, one engaged by the petitioner, the guardian, and one engaged by the court, were of the opinion that Mr. Fiori would remain as he was and had been for the

past 17 years but that he could be sustained for another 10 to 20 years. The Supreme Court addressed the issue of who should decide and the manner of making the decisions. The court concluded that for a person who was once competent, the substituted judgment standard was the proper approach.

"We also hold that a close family member is well-suited to the role of substitute decision-maker. . . . Close family members are usually the most knowledgeable about the patient's preferences, goals and values; they have an understanding of the nuances of our personality to set us apart as individuals. . . . In addition to the greater knowledge of the PVS patient's personal views, close family members have a special bond with the PVS patient. 'Our experience informs us that family members are generally most concerned with the welfare of a patient . . . .' " *In re Fiori* at 606, 673 A.2d at 912. (citations omitted)

As part of note 11, when discussing the issue of such decisions for persons who had never had capacity, the court stated the following:

"As discussed herein, we decide today that a close family member of a once competent adult who is now in a permanent vegetative state may effectuate substituted judgment on the patient's behalf. We determine that where there is enough data for the decision-maker to ascertain what the patient would have desired, the decision-maker *must* effectuate substituted judgment. Where the patient's desires can be discerned via substituted judgment, it would be improper to employ instead the objective best interests standard to make that decision. Thus, in cases such as Fiori's where a relative of a once competent adult, now in a permanent vegetative state, can effectuate a substituted judgment, a best interests analysis may not be employed.

"We recognize, however, that there will be situations where there is simply no basis to effectuate a substituted judgment. An example of this situation is where the patient is an infant, and thus never developed a personal ethical code or views on life. We are not here confronted with such a circumstance, and are loathe to determine now whether we will adopt the best interests standard for those types of situations." *Id.* at 605-606 n.11, 673 A.2d at 912 n.11. (emphasis in original)

The court noted that the court essentially has no role in this process so long as the family and the health care providers can agree. Quoting from Judge Beck's opinion in the Superior Court decision which was affirmed, it stated:

"[W]here there is a loving family, willing and able to assess what the patient would have decided as to his or her treatment, all necessary medical confirmations are in hand, and no one rightfully interested in the patient's treatment disputes the family['s] decision. . . . Those who disagree with this view and who favor court intervention in every case often cite the need for the court to protect the patient. Underlying this rationale is the philosophy that only courts can provide the necessary safeguards to assure protection of life. This is a narrow and unhealthy view. It violates the essential and traditional respect for family. It is yet another expansion of the idea that courts in our society are the repository of wisdom and the only institution available to protect human life and dignity." *Id.* at 607-608, 673 A.2d at 913 (quoting *Fiori,* 438 Pa. Super. 610, 627, 652 A.2d 1350, 1358 (1995)).

Finally, and in summary, the court defined "interested parties" to include close family members, the guardian

of the incompetent, attending physicians, or the care facility in which the patient is located. *Id.* at 607 n.13, 673 A.2d at 913 n.13. In the situation at hand, we have a person who has the capacity of an infant and as we find hereafter, has not developed a personal ethical code, views on life and has never been able to express her preferences on matters beyond her most immediate needs.

In addressing the issue of whether we should be applying a substituted judgment analysis or a best interests analysis, we found most persuasive *In the Matter of M.R.*, 135 N.J. 155, 638 A.2d 1274 (1994). This case involved a dispute between a father and a mother over who should be guardian and who should have physical custody of a moderately retarded 21-year-old woman with Down's syndrome. Both parties agreed that the child should be adjudicated incapacitated and was incapable of governing herself and managing her affairs. However, the court had to determine whether M.R. had the specific capacity to express a preference to reside with one parent or the other. After conducting an in camera hearing, the court concluded that M.R. lacked the specific capacity to decide where to live. In *In the Matter of M.R.*, the New Jersey Supreme Court discussed the analogous cases involving termination of medical treatment. It stated:

"The substituted-judgment and best-interest tests are not dichotomous, but represent points on a continuum of subjective and objective information leading to a reliable decision that gives as much weight as possible to the right of self-determination." *Id.* at 168, 638 A.2d at 1280.

The New Jersey court went on to note that:

"Developmentally-disabled people, like other people, can differ widely in their ability to make decisions . . .

we are reminded also that the mere fact that a person is generally incompetent does not mean that person is incompetent for all purposes . . . a person who is generally incompetent can still make choices about specific matters depending upon the facts of the case, someone who is unable to manage his or her own affairs may still be capable of deciding where and with whom to live." *Id.* at 169, 638 A.2d at 1281.

The New Jersey Supreme Court concluded that if the proponent proves by clear and convincing evidence that the incapacitated person is incapable of making the decision for herself, then the court should apply a best interests assessment. *Id.* at 169, 638 A.2d at 1281.

Finally, we turn to the Incapacitated Persons Act. Section 5502 of the Act, 20 Pa.C.S. §5502, in part, states:

"Recognizing that every individual has unique needs and differing abilities, it is the purpose of this chapter to promote the general welfare of all citizens by establishing a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them; which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible; and which accomplishes these objectives through the use of the least restrictive alternatives; and recognizing further that when guardianship services are necessary, it is important to facilitate the finding of suitable individuals or entities willing to serve as guardians." 20 Pa.C.S. §5502.

It has long been recognized that the "guardian is vested with the care and management of the person . . . under legal disability." *Matter of Terwilliger,* 304 Pa. Super.

553, 559, 450 A.2d 1376, 1380 (1982). (citations omitted) "[T]he appointee, being an officer of the court, is always under the court's control and is subject to its directions as to the person of the ward." *Id.* at 560, 450 A.2d at 1380. (citations omitted)

"The parens patriae power of our courts derives from the inherent equitable authority of the sovereign to protect those persons within the state who cannot protect themselves because of a legal disability . . . . Consistent therewith, it is acknowledged that a court's authority is at its widest reach when acting as an equity court to protect the person or property of an incompetent, . . . and has been described as 'plenary and potent to afford whatever relief may be necessary to protect his interest.' " *Id.* at 561, 450 A.2d at 1381. (citations omitted)

It follows that a guardian, especially a family member guardian, who, by virtue of the court appointment of guardianship and because of the traditional and statutory fiduciary responsibility reposed in the guardian, must be at least a participant in the decision concerning matters affecting the care and treatment of the incapacitated person.

## III. DISCUSSION OF THE EVIDENCE AND FINDINGS OF FACT

Petitioner, Nancy R. Thaler, as the deputy secretary of mental retardation, Department of Public Welfare, is authorized under section 406 of the MH/MR Act of 1996 to bring this petition.

Ruth Easly was born on December 2, 1927, and resided her first 14 years in Hastings, Cambria County, Pennsylvania. She was admitted to Polk Center in 1942 and was a resident of that facility until February 8, 1999.

This court does have jurisdiction of the subject matter and of the person.

Ruth Easly is accurately described as very small in stature, very unassuming and a very quiet person. When with a group of people, she likes to remain on the periphery and watch. She is fully ambulatory and has the capacity to communicate verbally. She enjoys looking at the pictures in magazines and watching television and going to church. For the past several years, Ruth Easly has resided in Meadowside Unit at Polk Center.

Because Ruth Easly originally came from Cambria County, Polk Center coordinated with the Cambria County Mental Retardation Base Service Unit to facilitate her return to community-based facility in Cambria County. In fact, Bureau of Mental Retardation and Cambria County Mental Health Base Service Unit negotiated a specific number of patients (14) to be returned to Cambria County from Polk Center. A "person-centered transition plan" was developed.

In May 1998, Ruth Easly first visited a facility in Cambria County. She had visited again in the summer and fall of 1998. She had her first overnight trip December 28 and 29 of 1998. From the get-go, the family was skeptical of the decision to attempt to move Ruth Easly into the community. Mr. Pickens, the social worker who explained the process of preparing Ruth Easly to leave Polk, stated that family members expressed fear for her safety and health concerns. Significantly, all of Ruth Easly's siblings are quite elderly. The goal for Ruth Easly, according to Mr. Pickens, was to provide her with the least restrictive setting that can best meet her needs. The community homes do not have staff physicians and nurses. Mr. Pickens testified that the Cambrian Hills fa-

cility is not truly an ICFMR but is a waiver home. Mr. Pickens credibly testified that while Ruth was at Cambrian Hills, as he observed her, she adjusted very quickly. "She expressed to us what she liked and did not like." Mr. Pickens further acknowledged that throughout the time that Ruth Easly was being prepared for the move to Cambrian Hills, that she appeared to be happy at Polk Center as well. He pointed out that at Cambrian Hills, she would have the privacy of her own bedroom. Ruth has her own television in her room at Polk. Mr. Pickens recited there was no television in her bedroom at Cambrian Hills. At Polk Center, Ruth shares a living area, very similar to a college dormitory or hospital facility, with 16 other patients and staff. She shares a bath with her roommate at Polk Center, whereas at Cambrian Hills she would have her own private bath. If Ruth wants to sleep in, she can sleep in at Cambrian Hills. She can "direct the rhythm of her life based on her needs rather than the institutional routine." Meals would be prepared for her. At the home at Cambrian Hills, there would be two to four residents, which means Ruth Easly would have one to three residents to interact with, together with two staff. At Polk, she would have 15 other residents to interact with on her floor at Meadowside, plus the patients she interacts with daily at the senior center and at "Our Place." Ruth enjoys walking around Meadowside, goes to gospel concerts at church and dances weekly. Ruth enjoys going to lunches at McDonald's and picnics at the County Two-Mile Run Park, 4-H Fair and Eat 'N Park. The two things about which Ruth seems to be most emphatic in her life are her enjoyment of church services and her doll collection.

Polk Center has 400 to 450 residents on the grounds and 120 residents in the Meadowside facility. Polk Cen-

ter physically resembles a college campus, and according to Mr. Pickens, functions for the residents similar to a small town. At Polk Center, Ruth would spend many of her days at "Our Place," a lounge/nightclub, which was open from 6 o'clock to 9 o'clock with big-screen television, nonalcoholic beer, and snacks. Also, Ruth attended the senior socialization center. Ruth went for rides in the van to the Dairy Queen for ice cream. Mr. Pickens, who knows Ruth very well, ultimately said that Ruth has "never verbally reliably indicated where she wants to live." It was noted that Ruth also enjoys being read to and that she, during her daily activity, participates in the senior center at Polk Center. Mr. Pickens explained that as they discussed with Ruth the extended visits on February 8, it was planned that she would go for three weeks and that she might not come back. He noted an absence of heightened anxiety. Ruth, when she becomes anxious, is known to demonstrate progressive and predictable abnormal behavior. She twists her hair, paces, and works toward being alone. Mr. Pickens stated that when Ruth returned to Polk in May of 1999, she adjusted well. Part of the dispute between the family and Polk Center focused on the fact that most of the family had moved from Cambria County into Allegheny and Westmoreland counties. Ruth's sisters, who have been active in her life, are all in their 70s and 80s and live a substantial distance from Cambria County.

Cecilia Kittell, the residential director of mental retardation in Cambria County, was Ruth's county case manager and waiver coordinator. She visited Ruth two times per week at Cambrian Hills. At Cambrian Hills, Ruth had a large bedroom with a full-sized double bed. The home is built for four patients, but only two were there

in addition to Ruth. The facility is to have two staff for four residents 24 hours per day. She stressed that residents at Cambrian Hills have choices. They can sleep in and choose menus. They can attend religious services. They are permitted to go to senior citizens' facilities and dances. Ruth went with staff to restaurants once each week. She described Ruth, while at Cambrian Hills, as pleasant, fun, socially responsive, and she would go to her room if she wanted to be alone. Ruth had one family visit at Cambrian Hills by her sister, Susan Kirsh. Susan lives in Spangler, Cambria County, and is Ruth's only sibling residing in Cambria County. This was Susan's only visit with Ruth in almost 30 years. Susan visited Ruth for approximately one hour. Significantly, Ms. Kittell testified that 52 percent of the funding for the Cambrian Hills facility is federal money. She noted that direct care staff at the facility is paid $6.25 per hour. She noted that there has been some significant turnover in staff, although some have transferred to different homes, and she acknowledged that there are not a lot of monetary reasons why staff at Cambrian Hills would want to stay around. She confirmed the direct care positions at Cambrian Hills are difficult to fill. She noted that across the state, community homes are experiencing problems finding direct care staff. She noted that on exhibit A, the guardian had selected Polk Center as his preference for Ruth Easly, and she confirmed that she had never known a situation where a patient had been transferred from a facility such as Polk by DPW over the family's objections. It was noted that on one occasion, Ruth became ill at Cambrian Hills, where she had blood pressure over 172/80. A doctor was not called; however, a Northwest nurse was called in. It would have been possible to take

Ruth to the emergency room in Johnstown which was 17 miles away. The contract between Cambria County and the Commonwealth provides that the county will be paid $70,000 per resident, per year, for residents who are out-processed from a state facility. Under the 2176 waiver program, the federal government pays 52.9 percent, and 47.1 is state-funded. She testified that anyone who would be staying in that facility would have to be staying under a 2176 waiver. Because she was concerned about who had authority to make decisions about medical care and "consent to care," and because she was aware that the family vigorously objected to Ruth being removed from Polk Center, the Cambria County Base Service Unit made the decision unilaterally to return Ruth to Polk Center. In describing Ruth's return to Polk Center on May 18, 1999, after having been at Cambrian Hills since February 8, Ms. Kittell told us that she told Ruth that she was being returned to Polk. Ruth then responded, "I'm going to Altoona Christmas shopping." Ruth did not resist but was quite hesitant. Ms. Kittell walked Ruth into the senior center at Polk. She observed anxious behavior on Ruth's part. After a while, Ruth got up and went off to be alone.

Thomas Hill, program manager at Polk Center, visited Ruth four or five times in the group home. He noted that when he visited her, Ruth showed him her room, her dresser, her bed. Ruth likes quiet, and frequently she would go to her bedroom to get away from noise. It appeared to him that Ruth had established some identity. His observation was that after three visits at Cambrian Hills that Ruth was getting acclimated. Mr. Hill acknowledged that Ruth was part of the five-year plan of the OMR to reduce the number of persons in institutional place-

ment. It was his opinion that Ruth was prepared for community living and that her needs would have been met at Cambrian Hills. On May 10, 1999, the guardian signed a 2176 waiver form designating Polk Center as the ICFMR facility preferred for Ruth Easly. That waiver form is in evidence as exhibit A.

As its expert, the Commonwealth called Jill Morrow M.D., who is board certified in pediatrics. Dr. Morrow had not visited Ruth Easly at Cambrian Hills; however, she did visit her at Polk Center. It was her opinion that all of Ruth Easly's special medical conditions can be treated in a community care facility. It was her opinion that Ruth Easly has a more full and rich life and more opportunity to mix within the community at Cambrian Hills than at Polk Center. It was her opinion that Ruth Easly had a more suitable environment in Cambrian Hills. Dr. Morrow generally advocates for a setting for all developmentally disabled patients other than large, congregate facilities.

Edward Sudosky, who is the facility director at Polk Center, confirmed that other than Ruth Easly, no patient who has left Polk Center has returned. He noted the staff ratio at Cambrian Hills was two staff during the daytime to four residents, whereas at Polk it is one staff to six residents. He noted that Meadowside houses 144 residents. One hundred three patients have left Polk Center since it began actively out-processing on the current program. Mr. Sudosky confirmed that the family has vehemently objected to Ruth Easly being removed from Polk Center. Because the family is objecting, the state was attempting to develop a mechanism to fund placement of Ruth Easly entirely with state dollars and thereby avoid the consent or hearing necessary for the federal waiver

program. There are many professionals at Polk Center who have worked with Ruth Easly for as long as 15 years. He acknowledged that a letter telling the family that Ruth would be discharged from Polk Center was sent out over his signature but without his authorization. He explained that normally before a person is discharged from Polk Center, the patient is at the new facility for no more than 60 days. In Ruth Easly's case, she had been "temporarily on leave" at Cambrian Hills for more than 60 days as an effort was being made to get concurrence to the move from her family. The letter stating Ruth would be discharged from Polk Center was sent out while Mr. Sudosky was on leave. He returned from leave on May 3 or 4. It was the letter announcing Ruth Easly's eminent discharge from Polk which mobilized the guardian and his lawyer to threaten litigation with the Commonwealth in Cambria County. Mr. Sudosky also described the infrastructure at Polk Center which includes direct care with the physicians and nurses, speech and hearing therapy, and occupational therapy. Mr. Sudosky stated that the cost for a patient at Polk Center has escalated to approximately $345 per day. At $345 per day, the cost to house a patient at Polk Center is about $126,000 per year, contrasted with $70,000 per year at Cambrian Hills. Polk is, by population, by staff and by comparison with the remaining Pennsylvania facilities, a very large mental retardation facility.

Thomas Snyder, a residential services supervisor at Polk Center, testified that he had repeatedly heard Mr. Pickens, who was in charge of the team planning Ruth Easly's return to the community, state that the team would not make the move of Ruth Easly without the family's concurrence. Mr. Snyder told the court of one other pa-

tient, C.C., who, after discharge to a community-based facility, was having problems adjusting to that facility and with his fellow patients at that facility. Mr. Snyder, contrasting Polk Center with community-based group homes, contended people in group homes he had monitored were more isolated than people in institutions. Patients at Polk have the larger population of their unit and facility activities, contrasted with two or three residents in group homes with whom the patients can interact.

Daniel Torisky testified as an expert for the guardian. He has substantial experience in dealing with developmentally disabled persons. In fact, Mr. Torisky has a child who is autistic. He described founding the first group home east of the Mississippi and has helped found nine community homes. Mr. Torisky told us that he is a proponent of choice, not for institutions or group homes. He noted that the average direct caregiver in a group home is earning about $6.31 per hour with minimal training, whereas the average caregiver at Polk Center is earning about $12 per hour with exhaustive background checks and training. For instance, the average tenure of an employee at a group home is 13 months, whereas at Polk Center, it is eight months before a new caregiver is even allowed to be alone with a patient. To enter a group home as a visitor, one must get permission to go into the facility. From his experience, a guest could not get permission to go into a facility such as Cambrian Hills unless the guest was family. However, at Western Center and at Polk, the facilities are "fish bowls," wide open so that any visitor can just drop in. He described many "counter incentives" in community facilities such as Cambrian Hills to self-reporting negative incidents involving harm to patients. He noted that by out-processing patients, the

Commonwealth is dramatically increasing the per diem cost in the institution because the number of patients is being reduced. By dramatically increasing the per diem costs, the Commonwealth enhances its argument to eliminate the institutions such as Polk and Western. Mr. Torisky told us that the incidents of founded abuse are much higher in the community residential facilities than at the institutions. He advocated for more family involvement in decision-making. Mr. Torisky noted that the truly pathetic cases are the profoundly incapacitated patients who have no surviving families to advocate for them. The state's desired posture is that the family and guardians have no standing, as the patient is a ward of the state. Mr. Torisky told us that he was familiar with Ruth Easly and has seen her on home visits with her family. Mr. Torisky complained that in Pennsylvania "once you're out, you're out forever in Pennsylvania." He complained that there should be a two-way street with Pennsylvania institutions so that residents who are discharged may, from time to time, as the need arises, be readmitted. Certainly this concept tracks part of the analysis expressed in the *Olmstead* opinion. *Olmstead* at 2189. The rotation in and out of an institution, based on this judge's experience, is far more pertinent to mental health cases than mental retardation cases; however, it is a treatment option (resource) which should be available.

Owen Sullivan, who is the solicitor for Cambria County, testified that as solicitor for Cambria County, without the family's consent and without hearing, Ruth Easly should not have been moved from Polk Center. Cambria County took the position that the move from Polk Center to Cambrian Hills was a level of care change; however, a level of care change for the better for Ruth

Easly. Once the guardian wrote to him and threatened legal action on the move of Ruth Easly without a hearing, Mr. Sullivan directed Cambria Mental Retardation to return her to Polk. Because it was a "level of care change," it was Mr. Sullivan's opinion, as solicitor for Cambria County, that the family should have been given an opportunity to have a hearing before the Department of Public Welfare, Office of Hearings and Appeals. He characterized the process as a "perfunctory administrative law" hearing.

Perhaps the most compelling witness that the court listened to was Mary Dvorchak, who is the 85-year-old sister of Ruth Easly. She is also the mother of the guardian. We received her testimony by telephone because Mary Dvorchak was at that time having lung and blood pressure problems and had to be on oxygen. She told us that Ruth is the youngest of 11 children in the family. She emphasized that the entire family has always objected to Ruth being moved from Polk Center where she had lived safely and comfortably for 57 years. She described Ms. Kittell's visit with her and her sisters. Ms. Dvorchak said that what Ms. Kittell had said to her and her sisters about what their plans were for Ruth simply "did not make a lot of sense. We were glad to see her go." Ms. Kittell, according to Mary Dvorchak, had described how Ruth would be trained to do crafts and to crochet. Ms. Dvorchak, knowing that Ruth has intellectual capacity somewhat below that of a child who is just attaining two years, remarked that the family all knew that Ruth could never have the capacity to undertake those types of activities. She explained how, when Ruth was very young, that she had tried to teach Ruth certain activities. She confirmed that Polk Center has developed

Ruth's abilities as best it can and has treated Ruth very well. If anything were wrong for Ruth, Polk would call the family. She described the medical care at Polk Center as excellent. She was gravely concerned that Ruth would be neglected and would not be safe at a community residential facility. She told us that since she has been at Polk Center for over 50 years, that she is safe and at home in that facility. Ms. Dvorchak described Ruth's visit with her on August 8, 1999. That was Ms. Dvorchak's birthday. She described that her sister Sue, the only sibling living in Cambria County, has never had much contact with Ruth. She stated that she, her sister Anne, and her sister Eleanor, who is a retired Benedictine nun, have had the most contact and involvement with Ruth and are closest to her. She stated that all of them oppose the move from Polk Center.

Anne Myzk, Ruth's other sister, testified that Mary Dvorchak and she have been the most involved with Ruth. "Why put her in a strange place?" She described how Ruth has her own television in her room and enjoys that. She especially enjoys singing and dancing and going to church. She told us that she did not believe what Ms. Kittell told them about what would be done for Ruth at Cambrian Hills. She stated that she called Cambrian Hills one time in March, but the person who answered the phone was unable to connect her with Ruth. In fact, no staff was then available because they were in Evansville. She told us that she worries constantly about Ruth's welfare and that she suffered great anxiety because of Ruth's move over the family's objection to Cambrian Hills.

Stephen Dvorchak, the guardian, testified that his mother and aunts are elderly and physically unable to

act as guardians for Ruth. Mr. Dvorchak was asked, by his mother and her sisters, to become a guardian. It was his impression as he visited Ruth at Polk Center that she was happy at that facility. She had her own room with a roommate, dresser and attached bathroom limited to two people and her own television in her room. In the room, he saw pictures of his mother and his Aunt Anne. He noted that it was a very young picture of his mother. He discussed a meeting with all the representatives at his attorney's office, but he emphasized that when questioned as to precisely what benefit Ruth would receive from the move, not one person at that conference responded and identified any specific benefit Ruth would attain from the move. He expressed concern about the quality of people hired at the community facilities such as Cambrian Hills, contrasted with the quality of staff at Polk Center, where the employees all are reasonably well paid and have substantial tenure. He noted there is virtually no turnover at Polk Center. He equated it to his business where he employs 14 people, and he notes that the guys he wants to keep, he pays what he has to keep them, and the guys he does not want to keep, he lets them go. He told us in addition to Ruth, his wife had an uncle who spent his entire life at Polk Center, so he became familiar with the facility. His wife's uncle passed away this past summer. He described Polk Center as providing Ruth with a community with which she was familiar. He noted that when his wife's uncle who had been a resident at Polk Center his entire life died, the facility sent down two cars full of people to his funeral because they were his community. He told us that Ruth's community revolves around where she resides, her social life at dances and at the senior center. Mr. Dvorchak was impressed

with how Ruth interacts with Judy from the senior center, and one time he was talking with her and that she had told him that Ruth interacts with the staff even more than she interacts with the other residents, and that Ruth had just left her office where she had "bummed a magazine." "Who knows if Northwestern is going to be there next year." He acknowledged that when Ruth was at Cambrian Hills, she did seem fine, but she seems even happier today at Polk. Mr. Dvorchak emphasized that Ruth's nature is such that when she is taken from her routine, she gets very nervous. "I think Ruth considers Polk to be home." Mr. Dvorchak stated that he had seen Ruth seven or eight times over the year that he had been guardian. On cross-examination, he told us that he thought Dr. Morrow was wrong. "I did not give her much credence. I work for a lot of people like that. They are educated but they sometimes lack common sense."

The guardian is certain that Ruth Easly is receiving excellent care at Polk Center. Ruth is comfortable with staff and has interacted with the same staff for many years.

Shari Slater testified at the continued hearing on September 14, 1999, and described her seven and one-half years as a residential services aide at Polk Center. She described she had two weeks on-the-job training before she began caring for a patient, how to manage bad behaviors, how to take pulses, use of monitors. She described human service training every year. She sees Ruth Easly daily. She accompanied Ruth Easly on one of the visits to a community care facility in Cambria County. It was not Cambrian Hills. Ms. Slater noted the procedures at the facility, in regard to access to medications, was sloppy. During the visit, Ruth was very nervous. Ruth must have gone to the bathroom 20 times in four and

one-half hours. Ms. Slater described Ruth as being more affectionate to staff after her visit. At Meadowside, Ruth is able to walk around the dormitory-style floor where her room is located. She is also able to walk down to another unit in the building to get her meds and to return.

Sue Barns, who is another primary caregiver for Ruth during the day shift at Polk Center, described the extensive training that she has had. She is paid $16 per hour and has worked with Ruth for five years and has been her primary sponsor for two years. She described training in fields such as fire safety, charting, how to observe and identify abuse, CPR and infection control. She stated that in her building, there are four LPNs and two RNs, that the RN is readily available and usually just downstairs in the dispensary. There is a doctor present on the grounds at Polk Center all day. Recently, on one occasion, it was noted that Ruth was in distress and was having trouble breathing. The LPN and RN checked Ruth immediately. Within five minutes, the institution doctor was present. Ruth was then taken to the emergency room at the Franklin Campus of the Northwest Medical Center (eight miles). Ruth attends football and baseball games, she visits the county park, she went for a haunted hayride, and enjoys picnics. Ruth assists in making pickles, jams and jellies, and can move freely about her building. She noted that after her return from Cambrian Hills, that it was difficult to induce Ruth to go for a ride and that she had to be reassured that she was only going shopping or to a restaurant and was coming back. Ms. Barns noted that when Ruth returned from Cambrian Hills, that her toenails and fingernails were very long, that her leg and underarm hair had not been shaved.

Michael Anderton has been employed at Polk Center for 18 years. He has a master's degree in sociology. He has worked with Ruth Easly as her social worker for four and one-half years. He noted that during the transitional team's evaluation of out-processing Ruth that no one ever asked him, "Do you think this is good for Ruth?" "Do you think this is where she should be?" In his opinion, based upon his day-to-day contact with Ruth, Ruth is adaptable and could do reasonably well anywhere, and that staying at Polk Center is in her best interests. She has done especially well since her return from Cambrian Hills. "To her, Polk Center is her community and a facility where people care for her and about her." He testified that he has supported other outplacements from Polk Center into the community. Trying to provide Ruth with selected choices would be a failure. At this precise point in time, Ruth is functioning in the best condition she has ever been. He confirmed, based upon his extensive knowledge of Ruth, that he could not be confident, using any method, to determine Ruth's preference, *i.e.,* what does she want. He confirmed that a group home is an appropriate placement for Ruth, but he does not agree that it is in her best interests. Mr. Anderton was of the opinion that Polk is the better placement for Ruth.

Judy Redding has known Ruth for 25 years and has worked for 18 years at the recreation center as a therapeutic recreation services worker. She works with Ruth "hands on" daily. Ruth attends a senior program from 9 a.m. until 3 p.m. Monday through Friday. When Ruth is in distress, she will hum, tongue thrust, twist her hair, and when really agitated she will pound her fist. She is able to vocalize, saying, "No. I don't want . . . ." She stated that Ruth had a friend by the name of Charlene,

who has been gone from Polk from the 1980s, but still speaks about her. Since Charlene, Ruth has not had any especially close relationships but does get along with her peers. She described Ruth as choosing to interact when she wants to. She is more commonly "on the outside looking in" and stays on the periphery of social activity.

Ms. Redding testified that she visited Ruth about four times when she was at the group home at Cambrian Hills. It was her impression that Ruth was doing well at the group home and was well provided for. Ms. Redding noted, for instance, that Ruth could sleep as late as she wanted and this was good for her because Ruth has never been a morning person. Ms. Redding stated that Ruth is quite happy at Polk Center. She was of the opinion that the group home was quieter, more peaceful.

Ruth's guardian ad litem told us that she does not believe Ruth can make choices for herself, and her family and guardian, as her advocate with the state, should be allowed to make the decision for her.

If we were simply allowing the family to make the judgment, we would conclude that the family clearly and for palpable, rational reasons desires that Ruth remain at Polk Center. The family believes that the level of care is better at Polk. The family worries about the impact of change on Ruth, and the family believes, as does Ruth's social worker, that Ruth has never functioned better than she is functioning right now at Polk Center. If we were to decide this case on a best interests assessment, we would conclude that Ruth could probably thrive in either environment and that the group home is smaller and offers certain amenities which might be attractive to Ruth. On the other hand, Polk has been her home for 57 years, and we have not heard conclusive evidence that demon-

strates that Ruth is better off at one facility or the other. We do conclude that Polk Center offers more comprehensive care for Ruth Easly, and the other clear benefit of Polk Center is that it offers a community atmosphere, whereas the group home offers more privacy. The quality of care at the group home, at least in contrast with Polk Center, is problematic. We give significant weight to the concept that if Ruth Easly is doing well where she is, then it is not in her best interests to change unless the proponent of change can show distinct and overriding benefits from the change. Taking into consideration all of the evidence which we have summarized, there is no distinct benefit that overrides the equally important benefits of permitting Ruth Easly to stay at Polk.

## IV. CONCLUSIONS

Ruth Easly has been examined by physicians, is mentally disabled and is an incapacitated person, who is profoundly mentally retarded. A guardian has been appointed for her person. Polk Center's guardianship office has acted as guardian of her estate.

Polk Center and the Pennsylvania Office of Mental Retardation is under a mandate to attempt to remove as many qualified residents as possible from institutions such as Polk Center to community residential facilities.

To retain a person in an institution, whether it be Polk Center, or even a community-based facility such as Cambrian Hills, would be discrimination unless the person was adjudicated, and from medical necessity, placed at the least restrictive facility pursuant to a court order under section 406 of the MH/MR Act of 1966, or unless the person consented. It is not possible for Ruth Easly to consent because she is an incapacitated person. The In-

capacity Act specifically provides that a guardian may not, as part of the guardian function, admit the ward to a state center for the mentally retarded. 20 Pa.C.S. §5521(f).

The Commonwealth should have afforded Ruth Easly's family and her guardian a hearing before making the decision to discharge her from Polk Center over their objection. The Commonwealth did, by letter, tell the family that Ruth Easly would be discharged from Polk Center. Cambrian Hills is not an intermediate care facility for persons with mental retardation. It is a waiver facility. Polk Center is an ICFMR. The letter discharging Ruth Easly from Polk Center was a "'level of care change" which triggered the resident's right to a hearing. The Commonwealth did not afford the family a hearing before making the decision to change the level of care.

This court has conducted extensive hearings and, therefore, the parties now have had a hearing, and findings of the court and adjudication of this matter pursuant to the petition under the MH/MR Act of 1966 more than accomplished the hearing rights that the parties would have had before the Department of Public Welfare Office of Hearings and Appeals.

The Commonwealth was aware that the family and guardian of Ruth Easly vigorously opposed the relocation of Ruth Easly from Polk Center to Cambrian Hills. Cambrian Hills is inconvenient for the family because it is in Cambria County, and Ruth Easly's closest family members reside in Allegheny County and Westmoreland County. Polk Center, under the circumstances of this case, is not a more restrictive setting than Cambrian Hills. At Cambrian Hills, Ruth Easly has her own room and the ability to direct the rhythm of her life. She has her own

room at Polk Center, which she shares with another resident. She has 15 other residents, a large number of staff to include LPNs, therapists, social workers, and direct caregivers, many of whom she has known for years, even decades, with whom to interact with on a constant basis. Every day, Ruth Easly visits the senior center, and on many days she goes to dances, restaurants, ball games, and for picnics in the park. At Cambrian Hills, she attended dances and the senior center, interacted on a daily basis with only two other residents and a smaller number of caregivers. The caregivers at Cambrian Hills are, based on pay, tenure and training, not equivalent to the caregivers on staff at Polk Center. We cannot determine Ruth Easly's preference. It is clear from the evidence that Ruth Easly cannot articulate a preference. But Ruth Easly is able to communicate her immediate likes and dislikes to those around her. Furthermore, those who have gotten to know her and can read her emotions are better able to care for her. By her actions and history, she is, and has been, comfortable at Polk Center. Our view of her and her living environment at Polk Center demonstrates that she is at ease and comfortable in the facility. The credible evidence supported that once ensconced at Cambrian Hills, she was comfortable and at ease at that facility.

Based upon the evidence presented to the court at this hearing, we conclude that Ruth Easly is better provided for at Polk Center and having her remain at Polk Center is in her best interests and is not discriminatory. Furthermore, we find that moving Ruth Easly from Polk Center to Cambrian Hills over the rational, well-founded objections of her family and of her legal guardian, was tantamount to moving her to Cambrian Hills over her objec-

tion. In the absence of the incapacitated person being able to express a preference, the family and guardian, clearly acting in the incapacitated person's best interests, do express the wishes of the patient; therefore, the removal of Ruth Easly from Polk Center to Cambrian Hills was without her consent and over her objection. We conclude that the petition under section 406 for commitment of Ruth Easly should be granted, but we approve and direct her commitment only to Polk Center.

In the event the Commonwealth, through its authority, as provided in the MH/MR Act of 1966, again based on facts developed after the hearing in this case, desires to move Ruth Easly from Polk Center, it must afford Ruth Easly, through her legal guardian, another hearing equivalent to 55 Pa. Code, chapter 275, and as recited by the Office of Mental Retardation bulletins of February 6, 1985 and July 12, 1996, which were the guardian ad litem's exhibits 1 and 2 in this proceeding. As counsel for the guardian argued, it seems burdensome to place on the family, guardians and other next-of-kin of the incapacitated person the extreme expense to bring these matters into court, and the concept of the administrative hearing as already developed by the Department of Welfare, we conclude, provides adequate due process protection.

## ORDER

And now, April 12, 2000, the petition for mental retardation commitment relating to Ruth Easly, is granted.

Ruth Easly is hereby committed pursuant to section 406 of the Mental Health/Mental Retardation Act of 1966 to Polk Center.

Before the facility director may remove Ruth Easly from Polk Center to a community-based facility without

the consent of Ruth Easly's legal guardian and immediate family, the director must first determine that:

(1) There has been a change of circumstances from the evidence presented to this court and from the findings of this court, and;

(2) The move is in her best interests.

The Department of Public Welfare, if Ruth Easly, via her legal guardian and immediate family, objects, shall afford Ruth Easly and her legal guardian a hearing as contemplated in title 55, chapter 275.